















√LS   12/24/02   11:32
3:01-CV-01800   WESTBOURNE INTL INC V. ARROWHEAD GENERAL
*162*
*O.*

FILED

02 DEC 23  AM 9:30

CLER... U.S. DISTRICT C...
...N DISTRICT OF CA...

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTBOURNE INTERNATIONAL, INC., a California Corp.,<br><br>Plaintiff,<br><br>vs.<br><br><br><br><br><br>ARROWHEAD GENERAL INSURANCE AGENCY, INC., a Minnesota corporation; YOUZOOM, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS | CASE NO. 01-CV-1800H (JFS)<br><br><br>Order 1) DENYING Plaintiff's Motion for Partial Summary Judgment on Issue of Copyright Ownership [Doc. 101]; 2) DENYING Defendants' Motion for Summary Judgment as to Plaintiff's First Cause of Action for Copyright Infringement [Doc. 112]; 3) GRANTING Defendants' Motion for Summary Judgment as to Plaintiff's Second and Third Causes of Action for Interference with Prospective Economic Advantage [Doc. 112]; 4) DENYING Plaintiff's Motion for Summary Judgment on Counterclaim for Copyright Infringement [Doc. 105]; and 5) GRANTING Plaintiff's Motion for Summary Judgment on Counterclaims for Unfair Competition, Breach of Confidence, and Common Law Misappropriation [Doc. 105] |

On October 10, 2002, Plaintiff Westbourne International, Inc. moved for partial summary judgment on the issue of copyright ownership and moved for summary judgment on Defendants' counterclaims. Defendants Arrowhead General Insurance Agency, Inc. and Youzoom, Inc. filed a cross

- 1 -

01CV1800

1  motion for summary judgment on Plaintiff's claims on October 22, 2002.  Oppositions to all three

2  motions were filed on November 4, 2002, and replies were filed on November 8, 2002.  A hearing was

3  held on November 18, 2002 at which Gregory S. Dovel and Donald B. Rosen appeared on behalf of

4  Plaintiff; Randy M. McElvain and Richard C. Rey II appeared on behalf of Defendants.  At the hearing,

5  the Court directed both parties to file supplemental briefs on issues related to the work for hire doctrine.

6  Plaintiff and Defendants filed their supplemental briefs on November 25, 2002.

7  For the following reasons, the Court 1) DENIES Plaintiff's motion for partial summary judgment

8  on the issue of copyright ownership; 2) DENIES Defendants' motion for summary judgment as to

9  Plaintiff's first cause of action for copyright infringement; 3) GRANTS Defendants' motion for

10  summary judgment as to Plaintiff's second and third causes of action for interference with prospective

11  economic advantage; 4) DENIES Plaintiff's motion for summary judgment on counterclaim for

12  copyright infringement; and 5) GRANTS Plaintiff's motion for summary judgment on counterclaims

13  for unfair competition, breach of confidence, and common law misappropriation.

14  <h1 style="text-align:center">I. Background</h1>

15  Plaintiff Westbourne is a Los Angeles software company, Defendant Arrowhead is an insurance

16  agency, and Defendant Youzoom, Inc. is a corporate affiliate of Arrowhead created to broker insurance

17  policies and provide other insurance related services over the internet.  These parties are in dispute over

18  the rights to the rules engine module of an original computer program that creates real-time pricing of

19  insurance products based on an applicant's risk profile.  Plaintiff alleges that Defendants have engaged

20  in copyright infringement, intentional interference with prospective economic advantage, and negligent

21  interference with prospective economic advantage.  Defendants have counterclaimed against Plaintiff

22  and Martin Desmond for copyright infringement, unfair competition, breach of confidence, and common

23  law misappropriation.

24  In 1998, Arrowhead hired two companies, Silvergate Software, Inc. and Cafesoft, LLC, to

25  develop insurance rating software for Arrowhead's use.  Cafesoft was hired to develop the graphic user

26  interface (GUI) for the insurance rating software.  (Defs.' Ex. MM in Supp. of Defs.' Mot. for Summ.

27  J.; Considine Dep. at 56:11-24).  Silvergate was hired to develop the rules engine module ("the module")

28  for the insurance rating software, which would calculate premiums based on Arrowhead's business rules.

1  Arrowhead had worked with Silvergate previously, and in March 1996 the two companies had signed
2  a software development agreement granting Arrowhead ownership of the application systems developed
3  by Silvergate for Arrowhead. (Considine Dep. at 45:4-9; Defs.' Ex. J in Supp. of Defs.' Mot. for Summ.
4  J.).

5      Through Silvergate, Martin Desmond became involved in developing the rules engine module
6  component of the insurance rating software.  Desmond had been an employee of Silvergate but left
7  briefly in 1996 to work for another company.  When Desmond returned in late 1996, he began billing
8  Silvergate for his services as Desmond Enterprises. (Desmond Dep. at 80:4-7; Considine Dep. at 23:11-
9  19, 24:4-24, 26:21-25, 54:19-55:6; Defs.' Ex. L in Supp. of Defs.' Mot. for Summ. J.).  In March of
10 1997, Desmond incorporated Westbourne International, Inc. and began billing Silvergate as an employee
11 of Westbourne. (Desmond Dep. at 30:12-25; Defs.' Ex. M in Supp. of Defs.' Mot. for Summ. J.).  In
12 early 1998, Desmond met with representatives of Silvergate and Arrowhead to discuss development of
13 the insurance rating software, and in May 1998, Desmond met with Arrowhead to display a prototype.
14 (Desmond Dep. at 125:2-18, 223:10-23, 431:10-433:19; Considine Dep. at 41-43, 218:5-219:17; Boyd
15 Dep. at 107:5-8; Defs.' Ex. N in Supp. of Defs.' Mot. for Summ. J.).

16     In September 1998, Desmond provided Arrowhead with a rules engine module for inclusion in
17 the insurance rating software, which Arrowhead named Winrater. (Boyd Decl. in Supp. of Defs.' Mot.
18 for Summ. J. at ¶6).  Winrater is a point of sale application that allows agents to enter information on
19 an applicant or   insurance risk and obtain a price quote for that customer. (Desmond Dep. at 218:21-
20 25).  Arrowhead distributed the software to its independent agents via CD-ROM. (Desmond Dep. at
21 218:21-25, 520:15-19).  In September 1999, Arrowhead established Youzoom, Inc. and in December
22 of that year Arrowhead placed a version of Winrater on the internet as part of its launch of the
23 Youzoom.com website. (Sweeney Dep. at 94:20-25, 97:11-15; Boyd Decl. in Supp. of Defs.' Mot. for
24 Summ. J at ¶7).  In 2000, Youzoom began developing a replacement rules engine module known as
25 RE2, which was implemented on Youzoom.com sometime between late 2000 and June 2001. (Boyd
26 Decl. in Supp. of Defs.' Mot. for Summ. J at ¶9; James Dep. at 92:23-93:4).

27     In May 2000, Westbourne obtained a copyright registration for a rules engine module, which it
28 named Primerater. (Defs.' Ex. OO in Supp. of Defs.' Mot. for Summ. J.).  Westbourne filed this action

- 3 -

01CV1800

1  against Arrowhead and Youzoom in May 2001 for 1) copyright infringement, 2) intentional interference
2  with prospective economic advantage, 3) negligent interference with prospective economic advantage,
3  4) declaratory relief, and 5) accounting.  Under the first cause of action, Westbourne alleges ownership
4  of the copyright for the module used by Arrowhead and Youzoom and claims that Arrowhead infringed
5  its license by transferring the module to Youzoom for use on its internet platform.  Westbourne alleges
6  that Youzoom infringed its copyright by reproducing and/or distributing copies of the program, preparing
7  derivative works based upon the software, and by publicly displaying such copies or derivative works
8  without Westbourne's permission.

9        Under the second and third causes of action, Westbourne claims that Arrowhead caused a
10  business deal between Quotesmith.com and Westbourne to fall through by claiming copyright ownership
11  of the module.  Westbourne alleges that Arrowhead knew or should have known that the copyright to
12  the module belonged to Westbourne, falsely stated otherwise, and therefore should be held liable under
13  either intentional interference with prospective economic advantage or negligent interference with
14  prospective economic advantage.

15        Arrowhead and Youzoom counterclaimed against Westbourne and Desmond for: 1) copyright
16  infringement, 2) unfair competition, 3) breach of confidence, and 4) common law misappropriation.
17  Under the first counterclaim, Arrowhead alleges that it owns the copyright for the Winrater technology
18  and that Westbourne and Desmond have infringed this copyright by incorporating its functions into
19  Primerater and displaying copies of Winrater in the promotion and sale of Primerater.

20        Under the second counterclaim, Defendants allege that Westbourne and Desmond (Counter-
21  Defendants) improperly suggest that Arrowhead, Youzoom, and Arrowhead business partners and
22  brokers were affiliated with Westbourne and were utilizing technology developed by Westbourne.
23  Under their breach of confidence counterclaim, Defendants allege that Counter-Defendants disclosed
24  portions of confidential and proprietary information to Quotesmith.com and possibly others.  Finally,
25  Defendants allege that Counter-Defendants misappropriated Arrowhead's technology utilized in
26  Winrater, as well as confidential and proprietary information related to the implementation of the
27  technology and Arrowhead's business rules and procedures.
28  / / / /

01CV1800

1    Both Plaintiff and Defendants have filed for summary judgment on all claims against them.

2  Plaintiff has also filed for partial summary judgment on the issue of copyright ownership of the module.

### II. Standard for Summary Judgment

4    Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and

5  admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

6  material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

7  A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S.

8  242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

9    The party moving for summary judgment bears the initial burden of establishing an absence of

10  a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving

11  party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must

12  set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The

13  non-moving party does not meet this burden by showing "some metaphysical doubt as to the material

14  facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the non-

15  moving party fails to make a sufficient showing of an element of its case, the moving party is entitled

16  to judgment as a matter of law. Celotex, 477 U.S. at 325.

17    When ruling on a summary judgment motion, the Court must examine all the evidence in the

18  light most favorable to the non-moving party.   Id.   The Court does not engage in credibility

19  determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions

20  are for the trier of fact. Anderson, 477 U.S. at 255.

### III. Copyright Ownership

22  **A.    Applicable Law**

23    To establish copyright infringement, a plaintiff must first demonstrate ownership of a valid

24  copyright and then show unauthorized copying of the original constituent elements of the work. Feist

25  Publications, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991). Under the Copyright Act,

26  ownership of a copyright vests initially in the creator of the work and automatically inheres in the work

27  at the moment it is created. 17 U.S.C. §§201(a), 302(a). While registration is not a requirement of

28  ////

- 5 -

1  copyright protection, it is a prerequisite to suit for copyright infringement and serves as prima facie

2  evidence of copyright validity in copyright actions.  17 U.S.C. §§411(a), 410(c).

3      There are two circumstances in which the creator of the work is not also the owner of the

4  copyright in the work: transfer of copyright ownership, 17 U.S.C. §201(d), and works made for hire, 17

5  U.S.C. §§ 201(b), 101.  For a transfer of ownership to be effected, there must be some form of writing

6  signed by the owner of the rights or by the owner's duly authorized agent.  17 U.S.C. §204(a); Radio

7  Television Espanola v. New World Entm't, 183 F.3d 922, 927 (9th Cir. 1999) ("no magic words must

8  be included in a document to satisfy §204(a)").

9      There are "two mutually exclusive ways" for a work to acquire work for hire status, one for

10  employees and one for independent contractors.  Cmty. for Creative Non-Violence v. Reid, 490 U.S.

11  730, 743 (1989).  If the creator of the work is an employee and the work was made within the scope of

12  his or her employment, the employer is the owner of the copyright.  17 U.S.C. §§101, 201(b).  If the

13  creator of the work is an independent contractor, then the work must be specially ordered or

14  commissioned, the work must fall within one of nine categories, and there must be an express written

15  instrument that the work shall be considered a work made for hire for the hiring party to obtain

16  ownership of the copyright.  Id.  To determine whether a party is an employee or independent contractor,

17  courts must look to the general common law of agency.  Reid, 490 U.S. at 751.

18  **B.    Arrowhead's Contract with Silvergate**

19      Defendants' primary argument is that Arrowhead owns the module by virtue of its software

20  development contract with Silvergate.  While it is correct that parties are free to create contracts

21  transferring copyright ownership, Defendants' argument is persuasive only if Silvergate actually owned

22  the copyright to be transferred.  See 17 U.S.C. §§204(a), 201; cf. Effects Assocs., Inc. v. Cohen, 908

23  F.2d 555, 557 (9th Cir. 1990) ("[i]f the copyright holder agrees to transfer ownership to another party,

24  that party must get the copyright holder to sign a piece of paper saying so"); Radio Television Espanola,

25  183 F.3d at 928 n.6 ("the memo from Television Espanola detailing the proposed contract terms does

26  not satisfy §204(a) because it was not written and signed by New World, the owner of the copyright.").

27      As Silvergate, the party attempting to transfer the copyright, is not the creator of the work in this

28  instance, the work for hire analysis is instructive for determining whether Silvergate obtained ownership

- 6 -

1  of the copyright through another means.  There are two circumstances in which the work for hire

2  doctrine might apply to give the hiring party, Silvergate, ownership of a copyright: one for employees

3  and one for independent contractors pursuant to a written agreement.  17 U.S.C. §101.  As there is no

4  evidence of a written agreement between Silvergate and Desmond or Westbourne, the Court turns to the

5  issue of whether Desmond or Westbourne was an employee of Silvergate at the time of the creation of

6  the program at issue.

7        The Supreme Court in <u>Reid</u> lists several factors to consider in determining whether a hired party

8  is an employee:

9          Among the other factors relevant to this inquiry are the skill required; the source
          of the instrumentalities and tools; the location of the work; the duration of the
10         relationship between the parties; whether the hiring party has the right to assign
          additional projects to the hired party; the extent of the hired party's discretion
11         over when and how long to work; the method of payment; the hired party's role
          in hiring and paying assistants; whether the work is part of the regular business
12         of the hiring party; whether the hiring party is in business; the provision of
          employee benefits; and the tax treatment of the hired party.
13

14  <u>Reid</u>, 490 U.S. at 751-52.

15        Arrowhead does not dispute that Desmond was Westbourne's employee at the time he created

16  the module.  (Defs.' Opp. to Pl.'s Statement of Undisputed Facts in Supp. of Mot. for Partial Summ. J.

17  at 3).  Thus, the hired party at issue is Westbourne.  Plaintiff presents undisputed evidence that the hired

18  party, Westbourne, was an independent contractor, not an employee of Silvergate.  Silvergate did not

19  provide any office space for Desmond, did not establish or set any hours of work for Desmond, and

20  exercised little control over Desmond's work on the rate engine.  (Considine Dep. at 190:11-22).

21  Furthermore, Silvergate considered Desmond a subcontractor who worked for his own entity, i.e.

22  Westbourne, and paid Westbourne on a 1099 basis.  (Considine Dep. at 202:19-23; 55:4-6).  Under the

23  <u>Reid</u> factors, this evidence establishes that Westbourne was an independent contractor at the time that

24  its employee, Desmond, created the module.  <u>See, e.g.</u>, <u>Metcalf v. Bocho</u>, 294 F.3d 1069, 1072-73 (9th

25  Cir. 2002) (plaintiffs were independent contractors as they were not on payroll, did not receive benefits,

26  used their own tools, had discretion over when and how long to work); <u>Kirk v. Harter</u>, 188 F.3d 1005,

27  1008-09 (8th Cir. 1999) (creator of computer program was independent contractor as pay was reported

28  throughout on form 1099 as payment to an independent contractor and creator received no benefits,

- 7 -

01CV1800

1  received payments on an irregular basis, continued to engage in computer consulting with other

2  companies, and hired a subcontractor); Graham v. James, 144 F.3d 229 (2d Cir. 1998) (computer

3  programmer was independent contractor because it was a skilled position, he was paid no benefits, no

4  payroll taxes were withheld, and he was engaged project-by-project).

5       Nor did the work for hire doctrine operate to transfer ownership from Silvergate to Arrowhead.

6  The doctrine only operates between the creator of a work and his employer; as it is undisputed that

7  Desmond created the module, it is Desmond who must fall within the work for hire doctrine, not

8  Silvergate.  Furthermore, software programs do not fall within any of the nine categories limiting the

9  independent contractor branch of the work for hire doctrine. See MacLean Assocs. v. Wm. M. Mercer-

10  Meidinger-Hansen, Inc., 952 F.2d 769, 775 n.5 (3d Cir. 1991) ("JEMSystem, a piece of computer

11  software, does not fall within any of the nine categories of 'specially ordered or commissioned' works

12  enumerated in 17 U.S.C.A. §101(2)").

13       Finally, Silvergate was not entitled to transfer ownership rights to the module as a duly

14  authorized agent of Desmond or Westbourne under 17 U.S.C. §204(a).  Defendants have provided no

15  evidence that Plaintiff explicitly authorized Silvergate, in either oral or written form, to transfer

16  ownership rights in software created by Plaintiff.  Such explicit authorization is necessary to satisfy the

17  policy behind 17 U.S.C. §204(a): ensuring that a creator does not give away his rights inadvertently. See

18  Effects, 908 F.2d at 557; cf. Cal. Civ. Code §2309 ("authority to enter into a contract required by law

19  to be in writing can only be given by an instrument in writing").

20       As Silvergate did not own the copyright to the module, did not obtain ownership rights through

21  the work for hire doctrine, and was not a duly authorized agent of the creator, it could not convey

22  ownership to Arrowhead through the software agreement.  Thus, the contract between Arrowhead and

23  Silvergate did not affect ownership rights of the module at issue.

24  **C.    Joint Work**

25       In their opposition to Plaintiff's motion for partial summary judgment, Defendants argue that

26  even if ownership rights to the module were not transferred to Arrowhead by its agreement with

27  Silvergate, the module is an interdependent part of Arrowhead's rating program Winrater, and thus part

28  of a joint work.  Under §201(a), the authors of a joint work are co-owners of the copyright in the work,

1   and co-owners cannot be liable to each other for infringement of the copyright. <u>Oddo v. Ries</u>, 743 F.2d

2   630, 632-33 (9th Cir. 1984).

3          Section 101 defines "joint work" as "a work prepared by two or more authors with the intention

4   that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17

5   U.S.C. §101. In the Ninth Circuit, a joint work is established by demonstrating: 1) a copyrightable work,

6   2) two or more authors, 3) a contribution from each author that is independently copyrightable, and 4)

7   an intention by the authors that their contributions be merged into inseparable or interdependent parts

8   of a unitary whole. <u>Aalmuhammed v. Lee</u>, 202 F.3d 1227, 1231 (9th Cir. 1999).

9          Here, Defendants argue that Arrowhead initiated the development of an insurance rating

10  program, Winrater, by hiring Silvergate and Cafesoft, and that all parties who contributed to the program

11  progressed with the intention that the GUI and the rules engine module would operate as a unitary whole.

12  Under Defendants' argument, Westbourne and Arrowhead are co-owners of the Winrater program:

13  Desmond created the rules engine as an employee of Westbourne and Cafesoft has assigned the rights

14  to the GUI to Arrowhead (Defs.' Exs. VV, WW in Supp. of Opp. to Counter-Defs.' Mot. for Summ. J.).

15         Defendants support their contention that the parties intended for the rules engine module to be

16  part of a unitary whole with a declaration from Steve Boyd, Arrowhead's chief technology officer.  In

17  his declaration, Boyd states:

18         Each vendor worked on different components that were intended to be part of the rating
           software.  Silvergate's contribution involved the rules engine module and Cafesoft's
19         contribution involved the user interface.  Each contribution involved a necessary
           component to the rating software. In addition, there are rate files prepared by Arrowhead
20         that are also a necessary component to the rating software.  Without each of these
           components the rating software would be incomplete.
21

22  (Boyd's Decl. in Opp'n to Partial Summ. J.).  Defendants also present evidence that Cafesoft and

23  Silvergate were hired by Arrowhead with the understanding that their contributions would be merged

24  into an insurance rating program, that Desmond began developing a rules engine module in response to

25  Arrowhead's interest in creating an insurance rating program, and that Desmond was aware that the rules

26  engine module he developed was intended for inclusion in the insurance rating program.  (Boyd Decl.

27  at ¶5; Defs. Ex. MM at ¶2-3; Desmond Dep. at 263:21-264:12, 125:2-18).

28  / / / /

1    Plaintiff provides evidence that Desmond began work on the rules engine prior to being

2    approached by Arrowhead (Desmond Dep. at 201:19-202:10), but argues that the issue of whether

3    Winrater is a joint work is irrelevant to the determination of who owns the rights to the rules engine

4    module.[1]  In support of its argument, Plaintiff states that it is undisputed that the rules engine module

5    is not a joint work and that the module is independently copyrightable.

6    However, the question of copyright ownership of the rules engine module cannot be answered

7    without first determining whether the module is part of a joint work.  If the module developed by

8    Desmond is found to be part of a joint work, Winrater, then Arrowhead and Westbourne share ownership

9    of not only the joint work as a whole, but also of its component parts. See Pye v. Mitchell, 574 F.2d 476,

10   480 (9th Cir. 1978) ("[i]f a work is a product of joint authorship, each co-author automatically becomes

11   a holder of an undivided interest in the whole"); Nimmer on Copyright §6.03 (2002).  The Ninth Circuit

12   discussed the import of joint ownership in a factually similar case, in which Ross created an engine and

13   Wigginton created the user interface portion of a computer spreadsheet program:

14       Indeed, if Ross and Wigginton intended to create a joint work, and both contributed
         copyrightable material to the resulting work, then they *may* have both obtained an
15       undivided interest in the entire work. In other words, Ross may have obtained a one-half
         ownership interest in the user interface and Wigginton may have obtained a one-half
16       interest in the engine.

17   Ashton-Tate Corp. v. Ross, 916 F.2d 516, 522 (9th Cir. 1990) (citation omitted).  Thus, if  Winrater is

18   found to be a joint work, then Arrowhead has obtained a one-half interest in the rules engine module and

19   therefore is incapable of infringing Plaintiff's Primerater copyright.

20   On the evidence presently before the Court, it appears likely that the module is part of a joint

21   work; however, Defendants have not brought summary judgment on this particular ground.  As

22   Defendants have set forth evidence that the module was intended to be a contribution to a joint work and

23   Plaintiff provides no evidence to the contrary, Plaintiff has not shown that it is the owner of the disputed

24   module as a matter of law.  Thus, the Court denies Plaintiff's motion for partial summary judgment on

25   the issue of copyright ownership.

26   The Court further notes that should Winrater be found to be a joint work, Westbourne and

27   Arrowhead would each own an undivided interest in both the rules engine module and the GUI

28

[1]Indeed, Plaintiff stated in its brief that it may stipulate that Winrater is a joint work.

01CV1800

1   components. Thus, infringement claims against either party based on these components of Winrater

2   would fail as a matter of law. See Oddo, 743 F.2d at 632-33.

3                                    **IV. Plaintiff's Claims**

4   **A.     Copyright Infringement**

5          In the alternative to their argument that Arrowhead owns the copyright to the module in dispute,

6   Defendants raise a number of defenses to Plaintiff's claim of copyright infringement. First, Defendants

7   argue that Plaintiff cannot show that Youzoom's use of the rating engine software exceeds the scope of

8   the implied license. Second, Defendants argue that Plaintiff is estopped from claiming infringement

9   because it was well aware that the rules engine module would be used as part of the Youzoom.com

10  website and failed to object. Third, Defendants argue that according to its registration, Primerater was

11  not created until 2000 and it is undisputed that Arrowhead began using the technology in 1998.

12  Therefore, Defendants argue that they could not have infringed the copyright in a work created after their

13  alleged acts of infringement.

14        **1.     Scope of Implied License[2]**

15              **a.     Applicable Law**

16          A copyright owner may grant a nonexclusive copyright license orally or by implication. Foad

17  Consulting Group, Inc. v. Musil Govan Azzalino, 270 F.3d 821, 825-26 (9th Cir. 2001); Effects, 908

18  F.2d at 558-59. Where the existence of a license is not contested, the plaintiff must prove copying of

19  the work beyond the scope of the defendant's license. See S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081,

20  1086 (9th Cir. 1989) ("[t]o prevail on its claim of copyright infringement, S.O.S. must prove (1)

21  ownership of copyright in the payroll programs, and (2) 'copying' of protectible expression by Payday

22  beyond the scope of Payday's license."); Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995)

23  ("in cases where only the scope of the license is at issue, the copyright owner bears the burden of proving

24  that the defendant's copying was unauthorized."). The scope of the license is determined by the conduct

25  of the parties. See Cal. Civ. Code §1621; Silva v. Providence Hospital of Oakland, 14 Cal. 2d 762, 773

26

27  _____

28        [2]Defendants argue that the agreement between Arrowhead and Silvergate constitutes an express license for the use of the module. As the Court has found that the agreement is not binding on Desmond or Westbourne, this argument must fail.

1  (1940).[3]  If the licensee's use goes beyond the scope of the implied license, the copyright owner has a

2  cause of action for copyright infringement.  Oddo, 743 F.2d at 634.

3          **b.      Internet Use**

4          Defendants argue that Plaintiff granted them an implied license for use of the module and that

5  Plaintiff cannot show that the module's use on the Youzoom.com website exceeded the scope of that

6  license.  Plaintiff concedes that by providing Arrowhead with a rules engine module sometime between

7  September 1998 and January 1999, Plaintiff granted Arrowhead an implied license for the desktop use

8  of that module.  However, Plaintiff argues that because Arrowhead rejected proposals that included both

9  desktop and web application, the scope of the implied license is necessarily limited to desktop use of the

10  module given to Arrowhead by Desmond.  Plaintiff also argues that the implied license granted to

11  Arrowhead was exceeded when Arrowhead transferred the module to Youzoom.

12          Defendants support their contention with evidence that Desmond was aware at the time of the

13  launch that Youzoom.com would be using the module, that Westbourne was paid for work done for

14  Arrowhead through June of 2000, approximately nine months after the launch of Youzoom.com and one

15  month after Plaintiff filed its copyright registration, and that a Westbourne business plan states that

16  Arrowhead contracted with Westbourne to develop a rate engine for both desktop and web use.

17  (Desmond Dep. at 612:14-615:5, 649:22-651:12; Defs.' Exs. M, HH).

18          However, issues of material fact remain unresolved.  The parties dispute the extent of Desmond's

19  involvement in creating the builds for the internet application.  Defendants point to emails from Stacia

20  Stiner and Stuart John (Defs.' Exs. FF, DD) and the fact that Desmond was paid through June of 2000,

21  to establish that Desmond was aware of and involved in testing of the internet application.  However,

22  Desmond states that "at no time was I ever involved with the testing of my rating engine for its use on

23  the internet by defendants."  (Desmond Decl. at ¶15).

24          Moreover, it is disputed whether web use of the insurance rating program was a project

25  requirement from the outset for Arrowhead and if so, whether Desmond was aware of this requirement.

26  Arrowhead officers state that the company intended for there to be web use of the program (Sweeney

27  ────────────────

28  [3]The existence and scope of an implied license is determined by state law.  See Foad, 270 F.3d
    at 827-32.  As federal preemption of the copyright field ensures that there is no California law directly
    on the issue of implied copyright licenses, the Court turns to California law on implied contracts.

1  Dep. at 41:14-44:25; Batcheller Dep. at 75:14-76:16), but Desmond states that he does not recall whether

2  web use was specifically stated as a project requirement.  (Desmond Dep. at 610:21-611:3, 612:4-12).

3        In light of these unresolved issues, the Court cannot find that the Defendants, as a matter of law,

4  possessed an implied license for web use of the module. Cf. Silva, 14 Cal. 2d at 774 ("before a contract

5  may be implied, it must be determined, as a question of fact, whether the parties acted in such a manner

6  as to provide the necessary foundation for it"); Gracen v. Bradford Exchange, 698 F.2d 300, 303 (7th

7  Cir. 1983) (applying Texas law, finding genuine issue of material fact concerning the scope of implied

8  license); Systems XIX, Inc. v. Parker, 30 F. Supp. 2d 1225, 1230 (N.D. Cal. 1998) (material issue of fact

9  as to whether recording studio had implied license precluded summary judgment); Natkin v. Winfrey,

10  111 F. Supp. 2d 1003, 1012 (N.D. Ill. E. Div. 2000) (issue of material fact as to scope of implied license

11  precluded summary judgment).

12        c.    RE2 Program

13        Defendants also argue that Youzoom's new version of the rules engine module, RE2, did not

14  infringe Westbourne's copyright. Even assuming that RE2 is a derivative work,[4] Defendants argue they

15  are entitled to summary judgment on this claim because §117 of the Copyright Act permits adaptations

16  of computer programs and because their implied license extends to the creation of a new version of the

17  module.

18        As to the first argument, the Ninth Circuit has held that licensees of computer software do not

19  qualify as owners under §117 and are not eligible for its protection.  MAI Sys. Corp. v. Peak Computer,

20  Inc., 991 F.2d 511, 518-19, n.5 (9th Cir. 1993).  Therefore, assuming for the purposes of this argument

21  that Defendants' rights to the module were acquired through license, Defendants cannot rely on the

22  protection of §117 for its development of RE2.

23        In support of their second argument, Defendants argue that the ability to create RE2 must be

24  within the scope of their implied license because of the ongoing need to alter, update, and improve

25  computer software.  However, Defendants offer little evidence in support of their contention that the

26  parties intended for Youzoom to create a derivative work as part of the module license.  Instead,

27

28        [4]In keeping with the posture of Defendants' summary judgment motion, the Court assumes, without deciding, that RE2 is a derivative work of the module at issue.

- 13 -

1   Defendants make a broad pronouncement that any type of upgrade, enhancement, modification or

2   debugging is permissible in a license to "use" software because otherwise the license would be

3   meaningless. This cannot be true, as the Ninth Circuit has held that copying of a software program for

4   the purpose of conducting routine maintenance and emergency repairs was beyond the scope of the

5   defendant's license to "use" the software. Mai Sys., 991 F.2d at 517-19. Furthermore, Plaintiff notes

6   that in the past, it was Desmond and not Arrowhead or Youzoom who made the changes each time

7   Arrowhead needed a modification to the module. Thus, the Court denies Defendants' motion for

8   summary judgment on the infringement claim as it extends to the creation of RE2.

9        **2.    Estoppel**

10        Defendants also argue that Plaintiff should be estopped from claiming that use of the module on

11   Youzoom.com constituted infringement because Plaintiff was aware that the rules engine module would

12   be used as part of the Youzoom.com website, Plaintiff was paid for development services related to this

13   application, and Plaintiff publicized the module's use on Youzoom.com in an effort to obtain business.[5]

14   Plaintiff argues that estoppel cannot apply because Westbourne repeatedly and consistently asserted its

15   ownership of the rules engine module.

16        Defendants must prove four elements to establish the defense of estoppel: "1) the party to be

17   estopped must know the facts; 2) he must intend that his conduct shall be acted on or must so act that

18   the party asserting the estoppel has a right to believe it is so intended; 3) the latter must be ignorant of

19   the true facts; and 4) he must rely on the former's conduct to his injury." Hampton v. Paramount

20   Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960).

21        Here, it is not clear that Defendants could reasonably believe that Plaintiff did not object to the

22   Youzoom.com application. It is undisputed that Plaintiff was aware of the module's use on

23   Youzoom.com at the time of the site's launch; however, it is disputed that Plaintiff was paid for the

24   development of this application. Furthermore, Plaintiff has presented evidence that Westbourne

25   attempted to negotiate with Arrowhead to expressly extend the license to include Youzoom.com.

26

27       [5]Although the title heading for Defendants' estoppel argument mentions the RE2 engine, the

28   body of the argument applies to the module's use on the Youzoom.com website. The Court will construe the estoppel argument to apply to the latter. Defendants have presented no evidence that Plaintiff knew of or encouraged Youzoom's development of a replacement module.

1    (Desmond Dep. at 330:9-331:22, 588:1-590:17; Pl. Ex. 10).  Thus, Arrowhead was aware that Plaintiff

2    claimed ownership rights to the rules engine module and that Plaintiff claimed at the time of the proposal

3    that any implied license did not include the Youzoom.com use.  As Defendants have not established that

4    they are entitled to the defense of estoppel as a matter of law, the Court denies the motion for summary

5    judgment on the basis of estoppel.

6         **3.    Scope of Primerater Registration**

7         Defendants point out that on the application for registration of Primerater, Westbourne indicates

8    that Primerater was completed in 2000.  On the basis of this information, Defendants argue that they

9    could not have infringed the copyright in a work that was created after their alleged acts of infringement.

10   Defendants do not dispute that Desmond wrote source code for a rules engine module used by

11   Arrowhead prior to 2000; rather they argue that copyright did not inhere in the module until it was

12   completed in 2000 and therefore infringement prior to that date was impossible.

13        Defendants do not cite any authority for the proposition that prior, incomplete versions of a work

14   are not copyrightable.  Furthermore, Defendants' argument that prior versions of the module were

15   incomplete until 2000 is undermined by the undisputed fact that their Winrater program relied on a

16   version of Desmond's rules engine module given to them in 1998.  Finally, assuming that Westbourne

17   owns the copyright to the rules engine module, this copyright inhered since the moment of creation.  17

18   U.S.C. §§302(a), 408(a).  Though Westbourne may have only obtained registration for a later version

19   of the module, this does not preclude a finding that it also owned the copyright to the earlier version used

20   by Defendants in their Winrater program.

21        To the extent that Defendants are arguing that Plaintiff's Primerater registration does not satisfy

22   the registration prerequisite for infringement litigation under §411, this too must fail.  Assuming that the

23   module used by Defendants was a prior version of Primerater and that Westbourne owned the copyright

24   to that prior version, registration of the 2000 version is sufficient.  Though the Ninth Circuit has not

25   directly addressed this issue, numerous other courts and a leading authority on copyright have found that

26   registration of a derivative work is sufficient to confer jurisdiction on an infringement action based on

27   a prior work.  See, e.g., Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 746-47 (2d Cir. 1998)

28   ("Because Streetwise is the owner of the copyright of both the derivative and pre-existing work, the

- 15 -

1   registration certificate relating to the derivative work in this circumstance will suffice to permit it to

2   maintain an action for infringement based on defendants' infringement of the pre-existing work");

3   Religious Tech. Ctr. v. Netcom On-line Communication Servs., Inc., 923 F. Supp. 1231, 1241 (N.D. Cal.

4   1995) ("[w]here, as here, the author of a collection or derivative work is also the author of the

5   preexisting work, registration of the collection is sufficient"); Howard v. Sterchi, 725 F. Supp. 1572,

6   1575-76 (N.D. Ga. 1989) (independent registration not necessary for works where plaintiff had registered

7   the plan books in which they were published); In re Indep. Serv. Orgs. Antitrust Litig., 964 F. Supp.

8   1469, 1473 (D. Kan. 1997); Nimmer on Copyright §7.16(B)(2)(2002).  Thus, the fact that Plaintiff has

9   only registered the 2000 version of the rules engine does not preclude a suit for infringement based on

10  Arrowhead's use of a prior version.

11  **B.      Interference with Prospective Economic Advantage**

12          To establish a claim for either intentional or negligent interference with prospective economic

13  advantage, a plaintiff must prove "that the defendant not only knowingly interfered with the plaintiff's

14  expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of

15  interference itself." Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 393 (1995); Lange

16  v. TIG Ins. Co., 68 Cal. App. 4th 1179, 1189 (1998).

17          Here, Plaintiff claims that the element of wrongful conduct is satisfied because overwhelming

18  evidence establishes that Westbourne owned the copyright to the module; therefore, according to

19  Plaintiff, any contrary assertions by Arrowhead were knowingly false.  As the court has decided that

20  there is an issue of material fact over who owns the copyright, this premise cannot be true.  Without

21  proof that Arrowhead made false statements to Quotesmith.com, Westbourne cannot make out a claim

22  for interference with prospective economic advantage.  Plaintiff's opportunity to produce further

23  evidence on this claim has passed as fact discovery is now closed in this case.  As the nonmoving party

24  must "go beyond the pleadings" to designate "specific facts showing that there is a genuine issue for

25  trial," Celotex, 477 U.S. at 324 (internal quotations omitted), Defendants' motion for summary judgment

26  on Plaintiff's claims for intentional interference with prospective advantage and negligent interference

27  with prospective advantage is granted.

28  / / / /

01CV1800

1

## V. Defendants' Counterclaims

2 **A.    Copyright Infringement**

3          Arrowhead alleges that Westbourne and Desmond ("Counter-Defendants") have infringed

4 Arrowhead's copyright in the GUI portion of Winrater by displaying copies of the GUI in the promotion

5 and sale of Westbourne's Primerater program. Counter-Defendants do not contest that Arrowhead owns

6 the copyright to the GUI. Instead, they make two arguments that Arrowhead's copyright infringement

7 claim must fail as a matter of law: 1) the screen shots of the GUI copied onto Westbourne's website did

8 not contain anything copyrightable, and 2) even if Counter-Defendants infringed Arrowhead's copyright,

9 their use is protected by the fair use defense.[6]

10        **1.    GUI Screen Shots**

11          Defendants' infringement counter-claim is based on Westbourne's use and publishing of screen

12 shots from the GUI on its website and in its promotional materials. Counter-Defendants argue that

13 nothing copyrightable was reproduced in the screen shots: the images are difficult to see and therefore

14 not considered "copied," recognizable features in the screen shots are generic to computer displays or

15 derived from the computer operating system or web browser and therefore not copyrightable, names of

16 the various items listed on the screen shots are specified by the rules engine not the GUI, and visible

17 boxes and blank spaces are not copyrightable.

18          Defendants do not attempt to rebut Westbourne's contention that the images on Westbourne's

19 website are not copyrightable. Rather, they argue that the copyrightable portion of the GUI, its source

20 code, was copied in the process of creating the screen shots for the website. The issue, then, is whether

21 the images were generated by a method that constitutes an infringing use of the source code. Cf. Mai

22 Systems, 991 F.2d at 517-19 (copying for purposes of copyright law occurs when a computer program

23

24          [6] In their initial motion, Counter-Defendants argued that the Court lacks jurisdiction because
Arrowhead had not satisfied the registration prerequisite for litigation set forth in 17 U.S.C. §411(a).
25 Subsequent to the motion, Arrowhead applied for and obtained a registration certificate for "Arrowhead
Windows Rater Application" and "Arrowhead WebRating (1999 Version)." In their reply, Counter-
26 Defendants conceded that there is now jurisdiction over Arrowhead's copyright claim.  The Court
agrees.  See, e.g., Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1108-09 (9th Cir. 1970)
27 (registration obtained after initiation of a copyright infringement suit satisfied the jurisdictional
requirement under 17 U.S.C. §13 (1909)); Haan Crafts Corp. v. Craft Masters, Inc., 683 F. Supp. 1234,
28 1242 (N.D. Ind. 1988); ISC-Bunker Ramo Corp. v. Altech, Inc., 765 F. Supp. 1308, 1309 (N.D. Ill.
1990); Nimmer on Copyright §7.16(B)(1)(a)(I)(2002).

1 is transferred from a permanent storage device to a computer's RAM).  One possible inference that may

2 be drawn from the existence of the images on Westbourne's website is that Westbourne generated the

3 images by running the source code for the GUI.  This is an infringing use of the GUI.  See id.  However,

4 it is unclear whether the images could be generated without copying the source code.  Neither side has

5 produced any evidence as to how the images on the website were generated.  Thus, there is an issue of

6 material fact as to whether the Counter-Defendants copied the copyrightable elements of the GUI.

7       **2.     Fair Use Defense**

8       Counter-Defendants argue that even if use of the screen shots was infringing, they are protected

9 by the fair use defense.  17 U.S.C. §107 establishes the fair use defense and lists four factors that courts

10 may consider in determining whether use of a copyrighted work may be considered fair use:

12       (1) the purpose and character of the use, including whether such use is of a commercial
         nature or is for nonprofit educational purposes;
         (2) the nature of the copyrighted work;
13       (3) the amount and substantiality of the portion used in relation to the copyrighted work
         as a whole; and
14       (4) the effect of the use upon the potential market for or value of the copyrighted work.

15 The four factors should be considered together "in light of the purposes of copyright."  Sony Computer

16 Entm't America, Inc. v. Bleem, LLC, 214 F.3d 1022, 1026 (9th Cir. 2000).  As fair use is an affirmative

17 defense, Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1403 (9th Cir. 1997),

18 Counter-Defendants have the initial burden of establishing the absence of a genuine issue of fact on each

19 issue material to its case.  See C.A.R. Transp. Brokerage v. Darden Rests., 213 F.3d 474, 480 (9th Cir.

20 2000).  Once Counter-Defendants have met this burden, Defendants must present "significant probative

21 evidence tending to support its claim or defense."  Darden Rests., 213 F.3d at 480 (internal citations and

22 quotations omitted).

23       **a.     Purpose and Character of Use**

24       Under the first factor, courts look to whether the use is "transformative," or "merely supersedes"

25 the original creation.  Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994).  The fact that a

26 use is for a commercial purpose is a "separate factor that tends to weigh against a finding of fair use."

27 Id. at 585.  Here, the use of the screen shots by Westbourne is for a commercial purpose, the promotion

28 / / / /

- 18 -

01CV1800

1  of Primerater.  Furthermore, the use at issue is simply copying the GUI and cannot be described as

2  transformative.

3    Counter-Defendants state that the first factor falls in their favor because the use of the screen

4  shots in a diagram benefitted the public by making their rating engine more understandable to a new

5  user.  They rely on <u>Bleem</u> for the proposition that the first factor weighs in the infringer's favor if the

6  use "redounds greatly to the purchasing public's benefit with very little corresponding loss to the

7  integrity of [the] copyrighted material." <u>Bleem</u>, 214 F.3d at 1027.  However, <u>Bleem</u>'s holding was based

8  on the fact that the use of the screen shots in that case was for the purpose of comparative advertising.

9  Here, Counter-Defendants' use is for classic commercial purposes and thus the factor weighs against

10 them.

11    **b.**  **Nature of Copyrighted Work**

12   The second factor is most relevant "when the original material and the copy are of a different

13 nature," <u>Bleem</u>, 214 F.3d at 1028, and "typically has not been terribly significant in the overall fair use

14 balancing." <u>Dr. Seuss</u>, 109 F.3d at 1402.  Here, the original material and the copy are identical, and the

15 factor does not weigh in favor of either side.

16    **c.**  **Amount and Substantiality of Portion Used**

17   As to the third factor, Counter-Defendants argue that only a few out of several possible screen

18 shots were used.  Defendants rebut with the claim that Counter-Defendants copied the entire GUI in the

19 process of generating the screen shot.  Taking the evidence in the light most favorable to the Defendants

20 as the non-moving party, <u>Celotex</u>, 477 U.S. at 325, the third factor weighs in favor of the Defendants.

21 However, Defendants do not contest that the screen shots themselves contained no copyrightable

22 elements; thus, this can be described as a case of "intermediate infringement." <u>Sony Computer Entm't,</u>

23 <u>Inc. v. Connectix Corp.</u>, 203 F.3d 596, 606 (9th Cir. 2000).  As a case of intermediate infringement,

24 "when the final product does not itself contain infringing material, this factor [amount and substantiality

25 of the portion used] is of very little weight." <u>Id.</u> (quotations and citations omitted).

26    **d.**  **Effect Upon Potential Market**

27   The fourth factor has been identified by the Ninth Circuit as the "most important factor," under

28 which courts consider "not only the extent of market harm caused by the particular actions of the alleged

1    infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant...

2    would result in a substantially adverse impact on the potential market." <u>Bleem</u>, 214 F.3d at 1029,

3    quoting <u>Campbell</u>, 510 U.S. at 590 (internal quotations and citations omitted). This factor overlaps with

4    the first in that "a work that merely supplants or supersedes another is likely to cause a substantially

5    adverse impact on the potential market of the original, [while] a transformative work is less likely to do

6    so." <u>Connectix</u>, 203 F.3d at 607.

7    　　Here, Counter-Defendants' copying is not transformative, but Counter-Defendants argue that the

8    intended purpose of the diagram in which the screen shots were used was to promote Primerater, which

9    does not affect the value of Defendants' business. Defendants reply that by copying Defendants' GUI,

10   Counter-Defendants have avoided the expense of creating their own GUI for advertising purposes.

11   However, they have not explained how Counter-Defendants' avoidance of expense impacts the potential

12   market for Defendants' GUI. In fact, the "avoidance of expense" argument can be made in every case

13   of copyright infringement and thus is not instructive to the analysis. As Counter-Defendants have met

14   their initial burden and Defendants have not come forward with evidence tending to support a finding

15   of market impact, this factor weighs in favor of Counter-Defendants.

16   　　Here, of the four factors, one weighs strongly in favor of the Defendants, one weighs in favor of

17   the Defendants but is of "little weight," <u>Connectix</u>, 203 F.3d at 608, and one weighs in favor of the

18   moving party, Counter-Defendants. As Counter-Defendants have the burden at trial on this issue, they

19   have not demonstrated as a matter of law that they are entitled to the fair use defense. The Court denies

20   Counter-Defendant's motion for summary judgment of non-infringement on Defendants' copyright

21   counterclaim.

22   **B.    Unfair Competition**

23   　　Defendants bring a counterclaim against Counter-Defendants for unfair competition under Cal.

24   Bus. & Prof. Code §17200. Under California's Unfair Competition Act (UCA), a cause of action lies

25   against a business engaged in "any unlawful, unfair or fraudulent business act or practice and unfair,

26   deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code §17200. Section 17200 establishes

27   three independent categories of actionable practices: those that are unlawful, those that are unfair, and

28   those that are fraudulent. <u>See Podolsky v. First Healthcare Corp.</u>, 50 Cal. App. 4th 632, 647 (1996).

1 Thus, for example, a practice may be prohibited by the UCA as unfair even if is not unlawful. Id. To

2 state a claim based on false advertising or promotional practices, the claimant must show that "members

3 of the public are likely to be deceived." Kasky v. Nike, Inc., 27 Cal. 4th 939, 951 (2002) (quotations

4 omitted) citing Comm. on Children's Television, Inc. v. Gen. Foods Corp., 35 Cal. 3d 197, 211 (1983).

5 While California courts have interpreted the statute broadly, "summary judgment is proper if a plaintiff

6 fails to establish a prima facie case." Eichman v. Fotomat Corp., 880 F.2d 149, 168 (9th Cir. 1989),

7 citing Motors, Inc. v. Times Mirror Co., 102 Cal. App. 3d 735, 740 (1980).

8     Defendants base their UCA counterclaim on representations contained in Westbourne's website

9 and promotional materials that allegedly gave consumers the false impression: 1) that Westbourne was

10 affiliated with Arrowhead, Youzoom, and Arrowhead's agents and customers, 2) that Arrowhead,

11 Youzoom, and Arrowhead's agents and customers were using Primerater, and 3) that Westbourne

12 developed the insurance rating software by itself.

13     These allegations do not establish a prima facie case of unfair competition against Westbourne

14 and Desmond. Defendants have not provided any evidence that members of the public are likely to be

15 deceived. As to the first ground, Arrowhead did have some affiliation with Westbourne; while Desmond

16 never worked directly for Arrowhead, he created a rules engine at Arrowhead's behest and was paid for

17 his services. Moreover, officers within Youzoom and Arrowhead refer to their companies as clients of

18 Westbourne or Desmond. (Boyd Dep. at 13-20; James Dep. at. 225:13-19). As to the second ground,

19 it is undisputed that Arrowhead and its agents were using a version of the rules engine created by

20 Desmond that was later registered as Primerater. As to the third ground, while it is true that the

21 insurance rating software was jointly developed, Defendants do not identify any express statement

22 otherwise on Westbourne's website or within their promotional materials. Thus the Court GRANTS

23 Plaintiff's motion for summary judgment against Defendants' UCA counter-claim.

24 **C.     Breach of Confidence**

25     To establish a cause of action for breach of confidence, Arrowhead must show that 1) it conveyed

26 confidential and novel information; 2) Counter-Defendants had knowledge that the information was

27 offered in confidence; 3) there was an understanding between Arrowhead and Counter-Defendants that

28 the information was offered on the condition of confidence; and 4) there was disclosure in violation of

1  the understanding.  Tele-Count Eng'rs v. Pacific Tel. & Tel., 168 Cal. App. 3d 455 (1985); Faris v.

2  Enberg, 97 Cal. App. 3d 309, 323 (1979).

3          Here, Arrowhead's counterclaim against Westbourne and Desmond is based on Counter-

4  Defendants' alleged disclosure of confidential information regarding 1) pre-built rules on Arrowhead's

5  rating of polices that enable the engine to calculate an insurance rate, 2) a data model called Arrowhead

6  Rater Format (ARF) used by the engine to receive requests and submit results for rating policies, and

7  3) information contained in Arrowhead's rate engine manual that lays out how Arrowhead's Winrater

8  works.

9          Arrowhead also briefly argues that Desmond's disclosure of Arrowhead's personnel and staffing

10  information was a breach of confidence.  The only evidence of such disclosure are notes by a

11  Quotesmith.com employee that Arrowhead has five people maintaining all their rates. (Defs.' Ex. JJJ

12  in Supp. of Opp. to Pl.'s Mot. for Summ. J.).  This argument fails because Arrowhead has provided no

13  evidence that this particular piece of information was confidential, that Desmond knew the information

14  was confidential, and that there was an understanding between Desmond and Arrowhead that the

15  information was provided on the condition of confidence. See Tele-Count, 168 Cal. App. 3d 455.

16          **1.      Pre-built Rules**

17          As to the first category of information, pre-built rules, Counter-Defendants claim that the only

18  information provided consisted of insurance underwriting guidelines and business rules, all of which are

19  publicly available pursuant to Cal Ins. Code §1861.05(b).[7]  In response, Counter-Claimants argue only

20  that Counter-Defendants have no evidence that information within the pre-built rules not disclosed

21  pursuant to §1861.05 is publicly available.  Counter-Claimants cite to conclusory deposition statements

22  that some information within the pre-built rules, specifically the way in which the rating rules are

23  interpreted by the insurance agencies, is not disclosed under §1861.05.[8]  (Bautista Dep. at 40:12-20,

24  48:7-21, 136:25-139:6, 157:2-19; Boyd Dep. at 20:1-8).  However, there are also statements from the

---

26          [7]Cal Ins. Code §1861.05(b) states: "Every insurer which desires to change any rate shall file a
27  complete rate application with the commissioner. A complete rate application shall include all data
referred to in Sections 1857.7, 1857.9, 1857.15, and 1864 and such other information as the
commissioner may require."

28          [8] Counter-Claimants also cite to emails sent to Desmond containing information about the pre-
built rules, but do not indicate whether this information was disclosed pursuant to §1861.05(b).

01CV1800

1   same Arrowhead officers that every piece of information is in the rating rules, that the publicly filed

2   documents include a step-by-step algorithm for calculating rates, and that information on the Youzoom

3   website could be used to determine how insurance carriers represented by Arrowhead handled every

4   potential insurance situation. (Bautista Dep. at 45:13-18, 80:11-25, 60:6-8; Boyd Dep. at 204:8-23).

5   Furthermore, Counter-Claimants fail to specifically identify which algorithms or business rules within

6   the allegedly disclosed material are not publicly filed. As Counter-Claimants have failed to "set forth

7   specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, the Court grants

8   summary judgment on the breach of confidence claim to the extent that it relies on Counter-Defendants'

9   alleged disclosure of pre-built rules.

10          **2.      Arrowhead Rater Format**

11          While both sides agree that Desmond and Arrowhead each contributed to the development of the

12  ARF, it is unclear who made what contribution or even what function the ARF performs. Nonetheless,

13  Counter-Claimants have provided no evidence that any allegedly confidential information in the ARF

14  was disclosed by Desmond. While there is evidence that Westbourne licensed Primerater to other

15  parties, there is no evidence that Westbourne disclosed the source code, which contains the allegedly

16  confidential information in the ARF. Furthermore, Westbourne has cited evidence that the ARF is based

17  on "Westbourne's proprietary CODIE format." (Bautista Dep. at 101:6-12; 98:4-24; 107:2-7; 204:4-16).

18  As the Counter-Claimants bear the burden of proving breach of confidence, Counter-Defendants can

19  succeed on summary judgment by demonstrating that "there is an absence of evidence to support the

20  non-moving party's case." Celotex, 477 U.S. at 325. Thus, the Court grants Counter-Defendants'

21  motion for summary judgment on the breach of confidence claim in so far as it relies on the second

22  category of information.

23          **3.      Rate Engine Manual**

24          There is also an absence of disclosure evidence as to Arrowhead's Rate Engine Manual. Though

25  Counter-Claimants make a conclusory allegation that the Rate Engine Manual was incorporated into the

26  Primerater User Guide disclosed to Quotesmith.com, they cite to no evidence to support this allegation,

27  nor do they provide evidence of confidential information within the Rate Engine Manual. Counter-

28  Defendants have provided the only evidence before this Court, that nothing in the Primerater guide was

1    confidential to Arrowhead. (Pradel Dep. at 68:22-70:8; Pl.'s Ex. 20). Thus, as Counter-Claimants have

2    failed to satisfy all of the elements of breach of confidence for each of the categories of information

3    alleged in their counterclaim, the Court grants summary judgment on the breach of confidence claim.

4    **D.    Misappropriation**

5          Arrowhead claims that Counter-Defendants misappropriated Arrowhead's point of sale

6    technology, including confidential and proprietary information related to the implementation of such

7    point-of-sale technology, along with Arrowhead's business rules and procedures. Arrowhead bases its

8    claim on Counter-Defendants' alleged misappropriation of the rules engine module and Arrowhead's

9    Rate Engine Manual. Counter-Defendants make two arguments that this claim must fail as a matter of

10   law: 1) the misappropriation claim is preempted by federal copyright law and 2) Arrowhead cannot

11   prove the elements of a misappropriation claim.

12         A state law cause of action is preempted under §301(a) of the Copyright Act if 1) the work

13   involved falls within the subject matter of the Copyright Act and 2) the rights asserted under state law

14   are equivalent to those protected by the Copyright Act. Kodadek v. MTV Networks, Inc., 152 F.3d

15   1209, 1212 (9th Cir. 1998). Under the second prong, courts will look at whether "the state law claim

16   contains an element not shared by the federal law." Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys.,

17   Inc., 7 F.3d 1434, 1439 (9th Cir. 1993).

18         Here, to the extent that Counter-Claimants' misappropriation claim relies on use of the module

19   and the manual in their entirety, it is clear that the claim is preempted. Neither side disputes that a

20   software program and its manual fall within the subject matter of the Copyright Act. As to the second

21   prong, Counter-Claimants misappropriation claim essentially relies on allegedly exclusive rights of

22   reproduction and distribution, both of which are protected under the Copyright Act. 17 U.S.C. §106.

23   Counter-Claimants identify no extra element within the tort of misappropriation that is not shared by the

24   Copyright Act.

25         Other courts addressing the issue of whether common law misappropriation is preempted by

26   federal copyright law have reached the same conclusion. See, e.g., Alcatel USA, Inc. v. DGI Techs.,

27   Inc., 166 F.3d 772, 785 (5th Cir. 1999) (misappropriation claim based on use of software and manuals

28   is preempted by federal copyright law); Warner Bros. v. American Broad. Co., 720 F.2d 231, 247 (2d

- 24 -

1  Cir. 1983) (state law claims that rely on the misappropriation branch of unfair competition are

2  preempted); Mitchell v. Penton/Indus. Publ'g Co., Inc., 486 F. Supp. 22, 24-27 (N.D. Ohio 1979);

3  Synercom Tech., Inc. v. Univ. Computing Co., 474 F. Supp. 37, 44 (N.D. Tex. 1979); Balboa Ins. Co.

4  v. Trans Global Equities, 218 Cal. App. 3d 1327, 1353 (1990) (misappropriation claim involving

5  unauthorized use or transfer of the software adds nothing to a  potential copyright infringement claim).

6        Arrowhead argues, however, that some of the information contained within the module and the

7  manual is uncopyrightable, and therefore does not fall within the subject matter of the Copyright Act.

8  In particular, §102(b) excludes "any idea, procedure, process, system, method of operation, concept,

9  principle, or discovery, regardless of the form in which it is described, explained, illustrated, or

10 embodied" from copyright protection. 17 U.S.C. §102(b). Arrowhead argues that its business rules and

11 procedures for rating insurance ("pre-built rules") are contained in the rules engine module and the

12 manual and that these rules and procedures fall within the §102(b) exclusion.

13       It may be true that the pre-built rules are noncopyrightable.  See Johnson Controls, Inc. v.

14 Phoenix Control Sys., Inc., 886 F.2d 1173, 1175 (9th Cir. 1989); Gates Rubber Co. v. Bando Chem.

15 Indus., Ltd., 9 F.3d 823, 837 (10th Cir. 1993).  However, as discussed above, the pre-built rules are

16 public information and therefore not subject to misappropriation.  Thus, the Court grants summary

17 judgment on Defendants' misappropriation counterclaim.

18                                    **VI. Conclusion**

19       For the reasons set forth above, the Court 1) DENIES Plaintiff's motion for partial summary

20 judgment on the issue of copyright ownership [Doc. 101]; 2) DENIES Defendants' motion for summary

21 judgment as to Plaintiff's first cause of action for copyright infringement [Doc. 112]; 3) GRANTS

22 Defendants' motion for summary judgment as to Plaintiff's second and third causes of action for

23 interference with prospective economic advantage [Doc. 112]; 4) DENIES Plaintiff's motion for

24 summary judgment on counterclaim for copyright infringement [Doc. 105]; and 5) GRANTS Plaintiff's

25 / / / /

26 / / / /

27 / / / /

28 / / / /

1  motion for summary judgment on counterclaims for unfair competition, breach of confidence, and

2  common law misappropriation [Doc. 105].

3  IT IS SO ORDERED.

4  Dated: 12/20/02

5

6  MARILYN L. HUFF, Chief Judge
7  UNITED STATES DISTRICT COURT

8
   Copies to:
9
   Gregory S. Dovel
10 Dovel and Luner
   333 South Grand Avenue, Suite 1560
11 Los Angeles, CA 90071-1519

12 Randy M. McElvain
   Weston and McElvain
13 888 West Sixth Street, Suite 1500
   Los Angeles, CA 90017
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

01CV1800