















KSR

3:01-CV-1800 WESTBOURNE INT'L V. ARROWHEAD GENERAL INSURANCE

*179*

*P/A.*

ORIGINAL

1  WESTON & McELVAIN LLP
   RANDY M. McELVAIN, Bar # 137046
2  RICHARD C. REY II, Bar # 193212
   888 West Sixth Street, 15th Floor
3  Los Angeles, California 90017
   Telephone: (213) 596-8000
4  Facsimile: (213) 596-8039

5  Attorneys for Defendants and Counter-
   Claimants ARROWHEAD GENERAL INSURANCE
6  AGENCY, INC., YOUZOOM, INC. and YOUZOOM
   INSURANCE SERVICES, INC.

7

FILED

03 FEB -3 PM 3:37

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:

8                UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11  WESTBOURNE INTERNATIONAL, INC., a )   CASE NO.01-CV-1800 H (JFS)
    California Corporation,            )
12                                     )   **DEFENDANTS' MEMORANDUM OF**
                    Plaintiff,         )   **POINTS AND AUTHORITIES IN**
13                                     )   **SUPPORT OF THEIR MOTION FOR**
         vs.                           )   **SUMMARY JUDGMENT (re JOINT**
14                                     )   **WORK)**
    ARROWHEAD GENERAL INSURANCE        )
15  AGENCY, INC., a Minnesota corporation; and )  Date:  March 3, 2003
    YOUZOOM, INC., A California Corporation;  )  Time:  10:30 a.m.
16  and DOES 1 through 10, inclusive,  )   Dept:  4
                                       )
17                  Defendants.        )   **[Assigned to the Hon. Marilyn Huff]**
                                       )
18                                     )   *[Filed concurrently with Defendants' Notice*
                                       )   *of Motion; Request for Judicial Notice,*
19                                     )   *Statement of Undisputed Facts, [Proposed]*
    AND RELATED COUNTERCLAIMS          )   *Judgment, and Declarations of Rey C. Rey II,*
20                                     )   *Glenn Bautista, Steve Boyd and Norbert*
                                       )   *Kuhnert]*
21

22

23

24

25

26

27

28

179

1

# TABLE OF CONTENTS

2                                                                    **PAGE(S)**

3

4   I.    Introduction .................................................................................................. 1

5   II.   Factual Background........................................................................................ 1

6   III.  Plaintiff Cannot Maintain An Action For Copyright Infringement, Because
7         Arrowhead's Rating Software Constitutes A Joint Work Under 17 U.S.C. § 101 . 5

8         A.    "Copyrightable Work" ................................................................. 6

9         B.    "Two Or More Authors" ............................................................. 6

10        C.    "Unitary Whole" ......................................................................... 11

11  IV.   Conclusion   ................................................................................................ 14

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2
PAGE(S)

3
## CASES

4
Aalmuhammed v. Lee

5
    202 F.3d 1227 (9th Cir. 2000) ................................................................ 5, 6, 8, 10

6
Apple Computer, Inc. v. Formula Int'l. v, Inc.

7
    725 F.2d 521 (9th Cir. 1984) ................................................................ 6

8
Apple Computer, Inc. v. Franklin Computer Corp.
    714 F.2d 1240 (3rd Cir. 1983) ............................................................. 6

9

10
Ashton-Tate Corp. v. Ross
    916 F.2d 516 (9th Cir. 1990) ............................................................... 5, 6

11
Brod v. General Publishing Group, Inc.

12
    32 Fed. App. 231 (9th Cir. 2002) ........................................................ 8

13
CCNV v. Reid

14
    490 U.S. 730 (1989) ............................................................................ 8, 9, 11

15
Cadence v. Avant! Corp.
    125 F.3d 824 (9th Cir. 1998) ............................................................... 3

16

17
Easter Seal Soc. For Crippled Children & Adults, Inc. v. Playboy Enters.
    815 F.2d 323 (5th Cir. 1987) ............................................................... 8, 11

18
Morrill v. The Smashing Pumpkins

19
    15 F.Supp.2d 1120 (C.D. Cal. 2001) .................................................. 8, 9, 10, 11

20
Oddo v. Ries

21
    743 F.2d 630 (9th Cir. 1984) ............................................................... 5

22
Sega Enterprises v. Accolade, Inc.

23
    1993 U.S. App. LEXIS 78,*23 (9th Cir. 1993) ................................... 6

24
Strauss v.Hearst Corp.

25
    8 U.S.P.Q. 2d 1832 (S.D.N.Y. denial 1988) ...................................... 8

26
Weissman v. Freeman
    868 F.2d 1313 (2nd Cir. 1989) ............................................................ 5

27

28

01 CV-1800 H

## STATUTES

17 U.S.C.
   § 101 ................................................................................................... 5, 7

## MISCELLANEOUS

Pfaffenberger, Webster's New World Computer Dictionary
   (9th Ed. 2001), p. 166 ........................................................................ 3

01 CV-1800 H

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This motion addresses whether Arrowhead's insurance rating software constitutes a "joint work," as defined by 17 U.S.C. Section 101 of the Copyright Act. The development of this software took several years and cost Arrowhead several million dollars. Arrowhead hired two outside vendors to create indispensable component parts to the software. These component parts were their respective contributions to Arrowhead's rating software, resulting in a joint work. Plaintiff cannot therefore, as a matter of law, sue for copyright infringement. Summary judgment should be granted in defendants' favor.

## II.   FACTUAL BACKGROUND.

Defendant and counter-claimant Arrowhead General Insurance Agency, Inc. ("Arrowhead") is an insurance agency located in San Diego. [See Defendants' Statement of Undisputed Facts ("Facts"), Fact No. 1.] Defendant and counter-claimant Youzoom, Inc. (including its wholly owned subsidiary, defendant Youzoom Insurance Services, Inc.) is a corporate affiliate of Arrowhead, established in August 1999 for the purpose of brokering insurance policies and providing other insurance related services over the Internet. [Fact No. 2.]

In 1997, Arrowhead decided to develop its own proprietary insurance "rating" technology that would redefine point-of-sale transactions for its agents and clients. [Fact No. 3.] It was to serve Arrowhead's many lines of business and was to be based entirely on Arrowhead's own business rules and logic. [Fact No. 4.] The goal of Arrowhead's rating technology was to provide timely, accurate and efficient real time insurance quotations based on an applicant's risk profile. [Fact No. 5.]

In early 1998, Arrowhead met with one of its software vendors, Silvergate Software, to discuss the development of the insurance rating software. [Fact No. 6.] Present at this meeting for Silvergate were Tom Considine and Martin Desmond. [Id.] Martin Desmond had worked for Silvergate at various times since 1996 both as an employee and on a contract basis, billing Silvergate initially as Desmond Enterprises and later as Westbourne International, Inc. [Fact Nos. 7-9.] Although no two people present at this meeting can agree on everything that was

1                                                          01 CV-1800 H

1   discussed, Silvergate indicated at the meeting that it was capable of developing the rating

2   software for Arrowhead. [Fact No. 10.]  After Arrowhead provided to Desmond certain rate

3   tables for rating a portion of an auto policy underwritten by Clarendon Insurance Company, he

4   created a proof of concept prototype that could produce a limited single auto policy quote. [Fact

5   No. 11.]

6        In or about May 1998, Mr. Desmond met with Arrowhead to display his proof of

7   concept prototype and to present a proposal for the "Smart Rater" project, which involved the

8   development of insurance rating engine software "proprietary" to Arrowhead. [Fact No. 12.]

9   The proposal addressed certain of Arrowhead's project requirements, one of which was the

10  creation of a desktop application. [Fact No. 13.]  After the meeting, Arrowhead hired Silvergate

11  (and paid) to develop one component of the rating software, which was the rules engine module.

12  [Fact No. 14.]  The rules engine module is the computational portion of the software that is

13  responsible for analyzing an applicant's risk profile based on Arrowhead's business rules and

14  then calculating the appropriate rate.  [Id.]

15       Thereafter, Desmond was hired by Silvergate (as a subcontractor) to write source code

16  for the rules engine component for Arrowhead's insurance rating software.[1]  [Fact No. 15.]

17  Desmond continued to work on the Arrowhead rating project for Silvergate (and got paid)

18  through June 2000. [Fact No. 16.]

19       In or around the time Silvergate was hired, Arrowhead also hired (and paid) Cafesoft to

20  create among other things the user interface component for Arrowhead's insurance rating

21  software. [Fact No. 17.]  Like Silvergate, Cafesoft had performed other software development

22  services for Arrowhead prior to the rating software project.  Cafesoft designed the overall

23  system architecture for the rating software and created many of its key components such as the

24  Graphical User Interface ("GUI") and the JAVA-Native-Interface ("JNI" or "JAVA Wrapper").[2]

25

---

26  [1] According to the Ninth Circuit, Cadence v. Avant! Corp., 125 F.3d 824, 826 (9th Cir. 1998),
    "source code" is defined as human readable programming language.

27  [2]  GUIs are defined as a "design for the part of the program that interacts with the user and uses
    icons to represent program features." See Pfaffenberger, Webster's New World Computer

28  Dictionary, at p. 166 (9th Ed. 2001).  The JAVA Wrapper is a component of the software that
    essentially "wraps" around the rules engine module.  Its purpose is to act as an interface

1 [Fact No. 18.] Cafesoft granted Arrowhead ownership of all work-product it created in
2 connection with the insurance rating software. [Fact No. 19.]

3     Cafesoft initially designed the rating software architecture to be based on "pluggable"
4 architecture. [Fact No. 20.] This means that for each line of business for Arrowhead, *i.e.*
5 *California Auto, California Renter's, etc.,* Cafesoft would create a "business plug-in." [Id.] For
6 each plug-in, it would write the source code to support the necessary business rules as well as
7 source code that supported the graphical user interface. [Fact No. 21.] This type of architecture
8 enabled Arrowhead to add lines of business by simply creating new plug-ins and conversely to
9 remove certain lines of business that had become obsolete by removing the unnecessary plug-ins
10 without having to revamp the entire program. [Fact No. 22.]

11     Because the rules engine affected, in large part, the parameters of the GUI, the most
12 logical and efficient way for Cafesoft to develop the plug-ins was to first have plaintiff complete
13 a version of the rules engine module or a "build." [Fact No. 23.] Usually, plaintiff would create
14 a new build each time Arrowhead wanted to include a new line of business into the software.
15 [Fact No. 24.] There were over a hundred builds in total, most of which were first sent to
16 Arrowhead to be tested and thereafter were provided to Cafesoft so that the GUI could be
17 modified accordingly. [Fact No. 25.] Likewise, it was not uncommon for Desmond to request
18 executable versions of the GUI from Cafesoft, which it provided. [Fact No. 26.] Plaintiff
19 needed executable versions of the GUI in order to literally see whether the rules engine was
20 calculating rates correctly. [Fact No. 27.]

21     In addition to developing the GUI, Cafesoft made several modifications to plaintiff's
22 source code in the rules engine module. This occurred in 1999, when plaintiff began attending
23 film school in Los Angeles and the rating software began to crash on a more frequent basis.
24 [Fact No. 28.] Because Desmond was increasingly difficult to reach, Arrowhead instructed
25 Cafesoft to review the source code written by Desmond and determine the origin of the

26
27
28 between the GUI written in the JAVA programming language and rules engine module written
in the "native" C++ programming language in order to allow both of these components to
interact more easily.

1  problem. [Id.] Based on that review, Cafesoft found various bugs in the source code and would

2  then make necessary modifications thereto. [Fact No. 29.]

3       Arrowhead paid its software vendors over $3,000,000 to develop its insurance rating

4  software. [Fact No. 30.] Arrowhead participated in the development process by attending

5  meetings with its vendors to discuss software requirements and other matters affecting the

6  development, in addition to regular communications via emails and over the telephone. [Fact

7  31.] Arrowhead also had to educate its vendors on the rules and logic for performing insurance

8  rating, including providing necessary written materials and information on algorithms and

9  processes for various types of insurance rating.[3] [Fact No. 32.] There are a great deal of emails

10  between Arrowhead and its vendors regarding the development of its rating software. [See e.g.

11  Exhibits R-S of the Declaration of Glenn Bautista, Exhibits M, N, P & Q of the Declaration of

12  Steve Boyd and Exhibit T of Norbert Kuhnert.]

13       Arrowhead's rating software utilizes a data model, known as Arrowhead Rating Format

14  or ARF, which had to be and is supported by both the rules engine module and the user

15  interface. [Fact No. 34.] The data model essentially contains the fields of information (or data)

16  that are relevant to rating the various types of insurance policies encompassed by Arrowhead's

17  rating software. [Fact No. 35.] The creation of the data model utilized by the rating software

18  involved collaboration between Arrowhead personnel and its vendors involved in the project.

19  [Fact Nos. 36-39.]

20       Furthermore, because rate accuracy was the most important function of the software,

21  Arrowhead was responsible for and conducted nearly all of the integrated testing on the rules

22  engine module. [Fact No. 40.] In fact, its Quality Assurance Department spent no less than a

23  thousand hours on testing the rating software. [Fact No. 41.]

24       Arrowhead unveiled the first version of its insurance rating software in or around

25  September 1998 as a desktop application known as "Winrater." [Fact No. 42.] As Arrowhead

26

27

28  [3] Some of these materials provided to Desmond by Arrowhead included underwriting manuals from Arrowhead's carriers as well as rate table and guides specifically created by Arrowhead's business analysts. [Fact No. 33.]

01 CV-1800 H

1  expanded its lines of business, several additional versions were subsequently released.  Winrater

2  was distributed to Arrowhead's independent agents by way of CD-ROM.  [Fact No. 43.]  In or

3  around November 1999, Arrowhead implemented its insurance rating software on the Internet as

4  part of the launch of the Youzoom.com website.  [Fact No. 44.]  Arrowhead's rating software is

5  the result of the combined efforts of its two software vendors and its own personnel.  [Fact No.

6  45.]  Each vendor contributed necessary components to the software.  [Id.]  Without each such

7  component, including those created by Arrowhead (i.e. the rate files), its rating software would

8  be incomplete.  [Fact No. 46.]

9       Defendants submit that Desmond's work and services in connection with the rules

10  engine module involved an intended contribution to a joint work, specifically Arrowhead's

11  rating software.

**III.  PLAINTIFF CANNOT MAINTAIN AN ACTION FOR COPYRIGHT INFRINGEMENT, BECAUSE ARROWHEAD'S RATING SOFTWARE CONSTITUTES A JOINT WORK UNDER 17 U.S.C. § 101**

15       Under Section 101 of the Copyright Act, a joint work is defined as a work: (1) that is

16  copyrightable; (2) that is prepared by two or more authors; and, (3) in which, each author must

17  have intended that their contributions be merged into inseparable or interdependent parts of a

18  unitary whole.  17 U.S.C. § 101; Aalmuhammed v. Lee, 202 F.3d 1227, 1231 (9th Cir. 2000).

19       Once a joint work has been found, each author is held to be a co-owner that retains an

20  undivided interest in the entire work.  In such a situation, no cause of action for infringement

21  can exist, "because an individual cannot infringe his own copyright."  Ashton-Tate Corp. v.

22  Ross, 916 F.2d 516, 522 (9th Cir. 1990) (quoting Weissman v. Freeman, 868 F.2d 1313, 1318

23  (2nd Cir. 1989)); Oddo v. Ries, 743 F.2d 630, 632 (9th Cir. 1984) (holding that each author to a

24  joint work is a co-owner thereof that cannot be held liable to another co-owner for infringement

25  of copyright.).)

26       The undisputed facts of this case overwhelmingly show that the foregoing elements are

27  easily met as to Arrowhead's insurance rating software.  Plaintiff, therefore, has no valid

1   copyright infringement claim.[4]

2       A.    *"Copyrightable Work"*

3       The joint work at issue in this case, Arrowhead's rating software, is a computer program

4   developed to provide timely and accurate insurance quotations to agents and customers based

5   on a particular applicant's risk profile.  The initial release of its rating software was

6   Arrowhead's Winrater CD.  [Fact No. 42-43.]

7       There is no question or dispute that computer programs, such as Arrowhead's rating

8   software, are copyrightable.  17 U.S.C. § 101; <u>see</u> <u>e.g.</u>, <u>Sega Enterprises v. Accolade, Inc.</u>, 1993

9   U.S. App. LEXIS 78, *23 (9th Cir. 1993); <u>Apple Computer, Inc. v. Formula Int'l., Inc.</u>, 725 F.2d

10  521, 524-525 (9th Cir. 1984); and <u>Apple Computer, Inc. v. Franklin Computer Corp.</u>, 714 F.2d

11  1240, 1252-53 (3rd Cir. 1983).

12      B.    *"Two or More Authors"*

13      The Ninth Circuit has handled the determination of who is an "author" for the purpose of

14  joint authorship somewhat differently depending on the nature of the joint work at-issue.  In the

15  context of a computer program, in <u>Ashton-Tate v. Ross</u> the Ninth Circuit focused exclusively on

16  the requirement that the contribution involve copyrightable material.  (<u>See</u> <u>Ashton-Tate</u>, <u>supra</u>,

17  at pp. 521, stating that, "[t]he rule expressed by the District Court – that only contributors of

18  copyrightable material can be authors of a work – is not entirely settled, but is consistent with

19  the direction of our circuit has taken;" and, "our circuit holds that joint authorship requires each

20  author to make an independently copyrightable contribution.")  This requirement is easily

21  satisfied in this case.  Arrowhead indisputably made a copyrightable contribution to the rating

22  software, the bulk of which has been registered as a copyrighted work with the Copyright

23  Office.  [See Fact No. 47.]

24      In the context of a motion picture, however, the Ninth Circuit had to grapple with the

25  claim of co-authorship by one of the consultants to the film "Malcom X" in <u>Aalmuhammed v.</u>

26  <u>Lee</u>, 202 F.3d 1227, 1231 (9th Cir. 2000).  The plaintiff was a consultant on Islamic subject

27

28  _____
    [4]  Plaintiff's declaratory relief claim and accounting claim based on alleged copyright
    infringement are likewise invalid

1  matter, who claimed that his contributions to the film made him a "co-author." The Ninth

2  Circuit applied the following three factors for determining whether the plaintiff was a co-author

3  of a joint work: (1) whether the author "superintends" the work by exercising control; (2)

4  whether the "putative co-authors make objective manifestations of shared intent to be co-

5  authors"; and (3) whether "the audience appeal of the work turns on both contributions . . . ."

6  Id. at p. 1234. (The second element appears to overlap with the third element of 17 U.S.C.

7  Section 101 that the authors intend "their contributions be merged into inseparable or

8  interdependent parts of a unitary whole.")

9      Notably, the Ninth Circuit has indicated that the foregoing factors are not "a rigid

10  formula, because the creative relationships to which they apply vary too much." Id. at 1235.

11  Thus, the objective is to not simply dole out co-authorship status to individuals making minor

12  contributions to work, but rather to the "putative" authors responsible for creating the joint

13  work. Factors such as control, objective manifestations of intent to be co-authors, and audience

14  appeal turning on the contribution are all indicia of an actual author of a joint work.

15      Defendants do not believe that a rigid application of these factors is relevant to or

16  appropriate in this case. The rating software, or joint work, was created with the assistance of

17  two vendors, each of which wrote source code for separate components that are indispensable to

18  the function and performance of Arrowhead's the rating software. [Fact No. 45.] Without one

19  of these components, among the others, the rating software is incomplete. [Fact No. 46.]

20  Desmond wrote source code for the rules engine module and Cafesoft wrote source code for the

21  user interface (in addition to source code to debug the rules engine module). Fact Nos. 15, 28-

22  29.] (Of course, Arrowhead is the owner, and thus author, of the work performed and created

23  by Cafesoft. See Fact Nos. 18-19 & 47.) Although it did not write actual source code,

24  Arrowhead was intimately involved with the development of both the rules engine module and

25  the user interface. [See Fact Nos. 31-32.] Arrowhead was also involved with the creation of the

26  data model, or ARF, that is supported by both the rules engine module and the user interface.

27  [Fact Nos. 34, 36-39.] Finally, Arrowhead created all of the rate files containing its business

28  rules that are also part of the rating software, the absence of which would render it incomplete.

7

01 CV-1800 H

1   [Fact Nos. 33, 46.]  These facts establish that Arrowhead was an author of the joint work.

2        Even considering the Aalmuhammed factors, however, Arrowhead is an author of its

3   own rating software.  It clearly exercised significant control over the development of its rating

4   software given the nature of its involvement with and contribution to the joint work, and the

5   user interface contribution in particular.  (Indeed, the entire rating software was designed and

6   built to implement Arrowhead's own business rules and logic for rating various lines of

7   insurance.)  The "control" factor, however, has been more relevant to cases involving works

8   such as photographs, films and videos, where there are not clearly discernible components

9   created by separate authors.  See e.g., Aalmuhammed, supra, and Brod v. General Publishing

10  Group, Inc., 32 Fed. App. 231, 235 (9th Cir. 2002).  (See also, however, Morrill v. The

11  Smashing Pumpkins, 157 F.Supp.2d 1120, 1124 (C.D. Cal. 2001), the District Court, in granting

12  summary judgment in favor of defendant on the issue of joint work, found that both plaintiff and

13  defendant had exercised "creative control" over separate elements of a music video.  The

14  plaintiff filmed, edited and produced and produced the video, and the defendant wrote the music

15  and controlled the performance of the music.)

16        As to the second element, the record in this case is replete with evidence of "objective

17  manifestations" that parties intended their contributions be part of a joint work.[5]  The standard is

18  not whether the parties intended the legal consequence of joint authorship, but rather whether

19  the objective evidence shows the intent to be co-authors in a joint work.  Brod, supra, 32 Fed.

20  Appx. at p. 235.  In Brod, for example, the Ninth Circuit found sufficient objective

21  manifestations of intent by virtue of the parties "collaboration" in the publication of a book of

22  photographs taken by the plaintiff photographer:

23            "[Plaintiff] manifested his intent that he and [defendant] would be co-
24            authors by collaborating with [defendant], deferring to [defendant's]

25

26  [5] The intent need not be acknowledged; it must merely be evident from the nature of the work.
    See CCNV v. Reid, 490 U.S. 730, 753 (1989); and Easter Seal Soc. For Crippled Children &
    Adults, Inc. v. Playboy Enters., 815 F.2d 323, 337 (5th Cir. 1987) (explaining that "although the
27  parties have refused to acknowledge it...it seems clear to us that their contributions were inter-
    dependent parts of a unitary whole"); Strauss v. Hearst Corp., 8 U.S.P.Q. 2D 1832, 1837 & n. 5
28  (S.D.N.Y. denial 1988) (finding co-authorship despite one-party's denial of co-authorship
    intent).

8                          01 CV-1800 H

judgment regarding the positioning of the subject televisions and the camera angles prior to taking each picture, indicating to the film processor that the photographs were for use in a "t.v. book," delivering the transparencies to [defendant] for the mock-up book, and listing as the completion date 1997, rather than 1991, on the copyright registration form. Id. We conclude that no reasonable trier of fact could find that [defendant] was not a co-author of the photographs. Thus, [defendant] cannot be liable for infringement as a co-owner of the copyright." Id.

Similarly, in Morrill, supra, the District Court, in granting defendant's motion for summary judgment based on a finding of joint work, looked to evidence of plaintiff's "collaboration" with the defendant in finding an intent to be co-authors. 157 F.Supp.2d at 1124.

In this case, the creation and contribution of component parts, by multiple authors, to be included in a single computer program for rating insurance policies is itself sufficient objective evidence of intent. [Fact Nos. 45-46.] Nevertheless, there is substantial additional evidence of objective manifestations of intent to be co-authors, including:

(1) Arrowhead concurrently hired and paid the two vendors, Silvergate and Cafesoft, to create separate components that were to be included in its rating software, [Fact Nos. 14, 17 & 45];

(2) Desmond, of course, was hired by one of the vendors, Silvergate, to write source code for the rules engine module, [Fact No. 15];

(3) Arrowhead provided Desmond and Cafesoft with the requirements for its rating software, [See Fact No. 31];

(4) Arrowhead also provided plaintiff and Cafesoft with the materials (primarily rate tables and guides) and information regarding its business rules needed to properly develop the rating software so that it accurately rated insurance policies; indeed, there were numerous meetings, exchanged emails and phone conferences between Arrowhead and its vendors for this purpose, [Fact Nos. 31-33];

(5) Both the rules engine module and the user interface had to support, and do support, the same data model for each line of insurance to be rated by the software, and the data model was a collaborative effort, [Fact Nos. 34, 36-39];

(6) The rules engine module and the user interface each had to support, and do

9

01 CV-1800 H

support, a "plug-in" architecture for the lines of insurance to be rated by the software, [Fact Nos. 20-22.];

(7) During the development process the vendors shared and provided executable versions or builds of their respective components so that they could be both tested and made compatible, [Fact Nos. 25-27.];

(8) The rules engine module was designed to rate Arrowhead's insurance products, based on data required by Arrowhead's business rules and using rate files (in the form of spreadsheets) authored by Arrowhead's business analysts that are also part of the rating software, [See Fact Nos. 4 & 32 ];

(9) Desmond acknowledged in deposition the intent to merge the rules engine module with other components to constitute Arrowhead's rating software, [Fact No. 48]; and

(10) Without each of the components, including, but not limited to the rules engine module, the user interface and the rate files, Arrowhead's rating software would be incomplete.  [Fact No. 46.]

There is no plausible or factually supportable argument to be made that the objective manifestations of intent are anything other than Desmond's contribution to Arrowhead's rating software, i.e. the rules engine module, was intended to be part of a joint work.

Finally, the third element addressed by Aalmuhammed, that the audience "appeal" of the joint work turn on the contributions of the co-authors is also easily met in this case.  Although this element is seldom discussed in detail in the case law, it is really a matter of common sense in this case.  There is no appeal to a computer program that is incomplete.  As previously noted, the rating software requires each of its pertinent components, including (among others) the rules engine module, the user interface and the rate files in order to perform its intended function.  Thus, each of these contributions is required for the rating software to have its expected and intended appeal.  The user interface in particular is critical because it provides, among other things, the graphics that are viewed by whomever is using the rating software. (See Morrill, supra finding that the audience appeal associated with a music video not only turned on the

10

01 CV-1800 H

1    production of the video, but also the music it was intended to showcase and the performance of

2    that music in the video, which defendant had contributed to the video. 157 F.Supp.2d at 1125.)

3         C.      *"Unitary Whole"*

4        The final element of section 101 is that "the authors must intend their contribution to be

5    merged into inseparable or interdependent parts of a unitary whole." This addressed above in

6    the context of the Aalmuhammed court's analysis of who is an author of a joint work,

7    specifically, the element concerning the "objective manifestations" of intent. However, other

8    cases discussing this element recognize that intent is not something that need be acknowledged

9    in any form by the parties, but may in fact be evident simply from the nature of the work. (See

10    CCNV v. Reid, 490 U.S. 730, 753 (1989), stating that the intent need not be acknowledged; it

11    must merely be evident from the nature of the work; and Easter Seal Soc. For Crippled Children

12    & Adults, Inc. v. Playboy Enters., 815 F.2d 323, 337 (5th Cir. 1987), explaining that "although

13    the parties have refused to acknowledge it...it seems clear to us that their contributions were

14    inter-dependent parts of a unitary whole.")

15        The nature of the work involved in this case is itself sufficient to establish this element.

16    It is insurance rating software that contains and relies on various components that were created

17    and contributed by Desmond, Arrowhead and Cafesoft. [Fact Nos. 45-46.] Without these

18    components, which were designed to support much of the same plug-in architecture and data

19    model, the software would be incomplete. [Id.] Thus, they are inseparable and interdependent

20    parts of a "unitary whole," in this case Arrowhead's rating software.

21        Although the foregoing is itself sufficient to satisfy the third element, the evidence also

22    establishes that the principals from Cafesoft and Silvergate intended their contributions to be

23    merged to comprise Arrowhead's insurance rating software. [See Declaration of Norbert

24    Kuhnert ("Kuhnert Decl.") at ¶¶3,6; Declaration of Steve Boyd ("Boyd Decl.") at ¶4, Exhibit D

25    of the Declaration of Richard C. Rey at pp. 219-220 and Exhibit U of Defendants' Request for

26    Judicial Notice. ] Plaintiff has admitted as much in his deposition:

27

28    ///

01 CV-1800 H

Q:   Okay. After this early stage rating solution that you demonstrated in May 1998, what -- was the user interface portion of it pulled out of the rating solution that you were working on?

A:   After May of 1998?

Q:   Yes.

A:   Yes.

Q:   Why.

A:   **I built the rate engine into a DLL so it could be utilized as a component which could be used to power other user interfaces.**

Q:   **Then was another company working on a user interface, to your knowledge, that would work in conjunction with the rating engine component?**

A:   **Yes.**

Q:   **What company was that?**

A:   **Cafesoft.**

Q:   Was there a need to coordinate programming between Cafesoft and the rating engine solution that you were working on?

A.   To the extent that "coordinate" pertains to their need to have the information about how to interface with Westbourne's rating engine software, yes.

Q:   Okay. After this May 1998 meeting that you had with Arrowhead where you did this demonstration for them, do you recall any discussions with Arrowhead about a plan to move forward with further development of a rating engine solution?

A:   I did.

Q:   What conversations did you have in that regard?

A:   **Conversation I recall are that Arrowhead indicated that they were very pleased about the initial rating software, and they were – they would like to use it as part of their rating software application for the agent base. [¶] They asked me to provide that technology and also indicated that they wanted Cafesoft to develop a graphical user interface that was going to be**

12

01 CV-1800 H

part of Arrowhead's rating software application.

**Q:    Did they indicate to you how they intended to use this rating engine solution?**

**A:    They indicated that they wanted to use it for the agent base.  The initial application they discussed was an application distributed on CD ROM [Winrater] to roughly 1,000 agents.**

Q:    Was this going to be a point-of-sale application?

A:    That was my understanding, yes.

[See Desmond Depo., Exhibit C to the Rey Decl., at pp. 263-267 (emphasis added).]

In addition to the foregoing there are a wealth of emails establishing the collaborative efforts between Arrowhead and its software vendors, as well as between the vendors, undertaken in order to create and develop Arrowhead's rating software.  [See e.g., **(1)** Martin Desmond email to "Stu" from Cafesoft (7/7/98) at p. SG0361 of Exhibit T to the Kuhnert Decl., stating, *"Stress testing is a good idea, though my immediate QA priority is rate accuracy.  DLL code is fully reentrant.  Thanks for pointing out the GC issue, can you help me steer clear of trouble with this?"*; **(2)** Stuart John (of Cafesoft) email to Desmond (7/6/98) at p. SG0363 of Exhibit T to the Kuhnert Decl., stating, *"I thought the String parameter was a file that you would parse, then write the results back into.  Actually your way is better, since we know it is easy enough to convert a JNI String to a char[] i'll just pass in the request as a String and you pass me back the results as a String.  We can dispense with any intermediate files, which will help in a server situation where we would have to instance them."*; and **(3)** Steve Boyd (Arrowhead) email to Gary (Cafesoft) (7/1/98) at p. 7 of Exhibit M to the Boyd Decl., stating, *"I think Martin and I came up with the best method for handling the violations.  You guys maintain a database of DMV codes, descriptions and SVC codes.  You then prompt the agent to select the appropriate DMV violation along with the violation and conviction dates.  You in turn send Martin the SVC code along with the violation and conviction dates.  Martin will map the SVC code to a severity value and point description.  In return Martin gives back the point value for each violation."*]

1    Based on the foregoing, there can be no dispute that this was a singular project with

2    multiple coordinated contributions from various sources, including Desmond, Cafesoft and

3    Arrowhead.  Defendants are entitled to summary judgment in their favor.

4

5    **IV.    Conclusion.**

6    For the foregoing reasons, defendants respectfully request that this Court grant their

7    Motion for Summary Judgment as plaintiff's First, Fourth and Fifth Causes of Action.

8

9    Dated:  February 3, 2003                          WESTON & McELVAIN LLP

10

11                                                     By:_____

12                                                          Randy M. McElvain

13                                                          Richard C. Rey II

                                                          Attorneys for Defendants and
14                                                        Counterclaimants, ARROWHEAD
                                                          GENERAL INSURANCE AGENCY,
15                                                        INC., YOUZOOM, INC., and YOUZOOM
                                                          INSURANCE SERVICES, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

## *PROOF OF SERVICE*

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 888 West Sixth Street, 15th Floor, Los Angeles, California 90017.

      On **February 3, 2003,** I served the foregoing document described as **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (re JOINT WORK)** on all parties as indicated below:

Gregory S. Dovel, Esq.
Donald B. Rosen, Esq.
Dovel & Luner, LLP
333 S. Grand Avenue, Suite 1560
Los Angeles, CA 90071
(213) 473-9888

[X]    by placing the true copies thereof enclosed in sealed envelopes addressed as stated above.

[_]    **BY MAIL as follows:**  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

[X]    **BY PERSONAL SERVICE:**  I caused said envelope to be delivered to the offices of the addressee as designated above.

[_]    **BY FACSIMILE:**   I sent such document from facsimile machine (213) 596-8039 on February 3, 2003.  I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine (213) 596-8039 which confirms said transmission and receipt.  I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelop(s) addressed to the parties listed above.

[X]    (Federal)    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

      Executed on **February 3, 2003,** at Los Angeles, California

*Anne M. Moreno*
_____
ANNE M. MORENO
