USDC SCAN INDEX SHEET

















RYC   12/4/03   11:42
3:01-CV-01800   WESTBOURNE INTL INC V. ARROWHEAD GENERAL
*382*
*O.*

FILED

03 DEC -2 PM 4: 10

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTBOURNE INTERNATIONAL, INC., a California Corp.,<br><br>Plaintiff,<br><br>vs.<br><br>ARROWHEAD GENERAL INSURANCE AGENCY, INC., a Minnesota corporation; YOUZOOM, INC., a California corporation; YOUZOOM INSURANCE SERVICES, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>Defendant. | CASE NO. 01-CV-1800H (JFS)<br><br>**ORDER (1) DENYING Defendants' Motion For Judgment As A Matter of Law; (2) DENYING Defendants' Motion For A New Trial ; and (3) DENYING Plaintiff's Motion For Attorney's Fees** |

AND RELATED COUNTERCLAIMS

Defendants Arrowhead General Insurance Agency, Inc. ("Arrowhead") , YouZoom, Inc., and YouZoom Insurance Services, Inc. (collectively "YouZoom") filed a motion for judgment as a matter of law and a motion for a new trial following a jury trial on copyright infringement. On August 8, 2003, the jury returned a verdict in favor of Plaintiff Westbourne International, Inc. ("Westbourne") in the amount of $5,823,000 in damages and infringing profits. Plaintiff moved for attorneys' fees and for a permanent injunction preventing defendants from infringing its copyright. On November 7 and November 21, 2003, the court held a hearing. Gregory S. Dovel appeared for plaintiff and Randy M. McElvain appeared for defendants.

382

01CV1800

1   For reasons given below, the Court DENIES defendants' motions for JMOL and for a new trial.

2   The Court also DENIES plaintiff's motion for attorney's fees.  Westbourne's motion for entry of a

3   permanent injunction is considered in a companion order.

4

5   **I. BACKGROUND**

6   Plaintiff Westbourne is a software company owned and operated by its sole representative,

7   Martin Desmond. Defendant Arrowhead is an insurance agency, and Defendant YouZoom is a corporate

8   affiliate of Arrowhead created to broker insurance policies and provide other insurance related services

9   over the Internet. These parties are in dispute over the rights to the rating engine module of an original

10  computer program that creates real-time pricing of insurance products based on an applicant's risk

11  profile.  The dispute grew out of Arrowhead's failure to contractually secure from Silvergate or

12  Westbourne the copyright in the rating engine module Arrowhead had asked Silvergate to develop.

13  In 1998, Arrowhead hired two companies, Silvergate Software, Inc. and Cafesoft, LLC, to

14  develop insurance rating software for Arrowhead's use. Cafesoft was hired to develop the graphical user

15  interface (GUI) for the insurance rating software. (Tr. Vol. V at 252:23-24; Considine Dep. at 56:11-

16  24).  Silvergate was hired to develop the rating engine module ("the module") for the insurance rating

17  software, which would calculate premiums based on Arrowhead's business rules (Id. at 8-9). Silvergate

18  hired Martin Desmond to design the module and Desmond billed Silvergate as an employee of

19  Westbourne International, a company he founded. (Tr. Vol. I at 83:4-5, 15-21; 90:10-15; Desmond Dep.

20  at 30:12-25;). In early 1998, Desmond met with representatives of Silvergate and Arrowhead to discuss

21  development of the insurance rating software, and in May 1998, Desmond met with Arrowhead to

22  display a prototype.  (Tr. Vol. I at 89:14-16; Id. at 91:5-12; Desmond Dep. at 125:2-18, 223:10-23,

23  431:10-433:19; Considine Dep. at 41-43, 218:5-219:17; Boyd Dep. at 107:5-8). The rating software and

24  the graphical user interface ultimately functioned in unison but the actual integration of the components,

25  as well as the intention of the parties with regard to merging them, remains in dispute.

26  In September 1998, Desmond provided Arrowhead with a rules engine module for inclusion in

27  the insurance rating software, which Arrowhead named Winrater. (Tr. Vol. I at 116:13-16).  Winrater

28  is a point of sale application that allows agents to enter information on an applicant or insurance risk and

1    obtain a price quote for that customer.  (Tr. Vol. I at 117:16-118:4; Desmond Dep. at 218:21-25).

2    Arrowhead distributed the software to its independent agents via CD-ROM.  (Tr. Vol. I at 116:13-16;

3    Desmond Dep. at 218:21-25, 520:15-19).  In September 1999, Arrowhead established YouZoom, Inc.

4    and in December of that year Arrowhead placed a version of Winrater on the Internet as part of its launch

5    of the YouZoom.com website.  (Sweeney Dep. at 94:20-25, 97:11-15).  In 2000, YouZoom began

6    developing a replacement rules engine module known as RE2, which was deployed on YouZoom.com

7    sometime between late 2000 and June 2001.  (James Dep. at 92:23-93:4).

8           Westbourne filed this copyright infringement action against Arrowhead and YouZoom in May

9    2001.  The court had jurisdiction over this action under 28 U.S.C. §1338(a).  See Vestron v. Home Box

10   Office, Inc., 839 F.2d 1380, 1381-82 (9th Cir. 1988).  Westbourne claimed ownership of the copyright

11   for the module used by Arrowhead and YouZoom and alleged that Arrowhead infringed its license by

12   transferring the module to YouZoom for use on its Internet platform.  Westbourne alleged that YouZoom

13   infringed its copyright by reproducing and/or distributing copies of the program, preparing derivative

14   works based on the software, and by publicly displaying such copies or derivative works without

15   Westbourne's permission.  Arrowhead and YouZoom counterclaimed against Westbourne and Desmond

16   for copyright infringement, alleging that they owned the copyright for the Winrater technology and that

17   Westbourne and Desmond infringed this copyright by incorporating its functions into PrimeRater and

18   displaying copies of Winrater in the promotion and sale of PrimeRater.

19          The jury awarded plaintiff $5,823,000 and ruled against defendants on the counterclaim.  In

20   answering the special questions posed by the court, the jury held that defendants' use of PrimeRater in

21   applications other than Winrater exceeded the scope of Arrowhead's license in the software.  The jury

22   also specifically found RE2 to be a derivative work that infringed Westbourne's copyright in PrimeRater.

23   Special Questions 1 and 2.  Pursuant to the verdict, the court entered judgment on August 14, 2003.

24

25   **II. MOTION FOR JUDGMENT AS A MATTER OF LAW**

26   **A. Legal Standard**

27          Under Rule 50 of the Federal Rules of Civil Procedure, a court may grant a motion for judgment

28   as a matter of law (JMOL) only where "there is no legally sufficient basis for a jury to find for [the non-

1 moving] party." Fed. R. Civ. P. 50(a)(1).  Judgment as a matter of law is appropriate only if the

2 evidence, when "viewed in the light most favorable to the nonmoving party, permits only one reasonable

3 conclusion." Graves v. City of Coeur d'Alene, 339 F.3d 828, 838 (9th Cir. 2000).  See also McLean v.

4 Runyon, 222 F.3d 1150, 1153 (9th Cir. 2000).  The court must "draw all reasonable inferences in favor

5 of the nonmoving party, and it may not make credibility determinations or weight the evidence." Reeves

6 v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  So long as a legally sufficient basis

7 supports the jury's determination, the court will not disturb the verdict.

8

9 **B. Scope of the Implied License**

10      Defendants first argue that insufficient evidence existed to support the jury's finding that

11 defendants exceeded the scope of the implied license.  The court disagrees.  The scope of an implied

12 license is defined by the actual conduct of the parties. Effects Assoc., Inc. v.Cohen, 908 F.2d 555, 558

13 (9th Cir. 1990).  More specifically, a non-exclusive licensee, including an implied licensee, has no right

14 to re-sell or sublicense the rights he acquires "unless he has been expressly authorized to do so." Harris

15 v. Emus Records Corp., 734 F.2d 1329, 1333-35 (9th Cir. 1984).  Thus, the determination turns on the

16 conduct of the parties in the creation and operation of the license.

17      At trial, the jury heard evidence that the license permitted PrimeRater to be used on the Internet

18 only in the form of Winrater, the original software program for which PrimeRater was written, and in

19 no other way. (Tr. Vol. II at 183:5-11).  Internet usage of the program was prohibited with a narrow

20 exception for Winrater.  Plaintiff introduced evidence that Desmond rejected Arrowhead's efforts to

21 expand the scope of the license to broader Internet usage. (Tr. Vol. I at 147:25-148:6; Pl's Exh. 1).

22 Furthermore, the jury heard evidence that Desmond objected to YouZoom's deployment of the

23 PrimeRater engine on the Internet (Tr. Vol. II at 19:13-19).  The jury also had the opportunity to observe

24 the attitude and demeanor of the witnesses who testified.  The jury resolved the factual dispute about the

25 scope of the license in plaintiff's favor.  After the jury returned the verdict, the parties requested the jury

26 to answer a special question concerning the scope of the license.  The jury specifically found that

27 defendants' "use of the PrimeRater rating engine in applications other than Winrater exceeded the scope

28 of the license held by Arrowhead." Special Question 1.  In sum, there is substantial evidence in the

1   record for the jury to have concluded that plaintiff met its burden in demonstrating that defendants

2   exceeded the scope of the implied license in PrimeRater.

3

4   **C. Winrater as a Joint Work**

5   Defendants also argue that Winrater amounted to a joint work as a matter of law.  Section 101

6   of the Copyright Code defines "joint work" as "a work prepared by two or more authors with the

7   intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."

8   17 U.S.C. §101.  In the Ninth Circuit, a joint work is established by demonstrating: 1) a copyrightable

9   work, 2) two or more authors, 3) a contribution from each author that is independently copyrightable,

10  and 4) an intention by the authors that their contributions be merged into inseparable or interdependent

11  parts of a unitary whole.  Aalmuhammed v. Lee, 202 F.3d 1227, 1231 (9th Cir. 2000).  Contrary to

12  defendants' interpretation, Aalmuhammed is controlling precedent in this jurisdiction.

13  Under §201(a), the authors of a joint work are co-owners of the copyright in the work, and co-

14  owners cannot be liable to each other for infringement of the copyright.  Oddo v. Ries, 743 F.2d 630,

15  632-33 (9th Cir. 1984).  Co-owners of a joint work share ownership of not only the joint work as a

16  whole, but also of its component parts.  See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 522 (9th Cir.

17  1990); Pye v. Mitchell, 574 F.2d 476, 480 (9th Cir. 1978) ("[i]f a work is a product of joint authorship,

18  each co-author automatically becomes a holder of an undivided interest in the whole"); Nimmer on

19  Copyright §6.03 (2002).  Thus, had defendants been able to demonstrate that Winrater was a joint work,

20  and that they were therefore joint owners of all components of the program, they could not have been

21  held liable for infringing PrimeRater.

22  Defendants in this case bore the burden of proving co-authorship.  See Aalmuhammed, 202 F.3d

23  at 1234; Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998) (a co-authorship claimant bears the

24  burden of establishing that the parties fully intended to be co-authors); cf. Medforms, Inc. v. Healthcare

25  Mgmt. Solutions, Inc., 290 F.3d 98, 115 (2d Cir. 2002) (identifying joint work as an affirmative

26  defense).  Defendants had previously moved for summary judgment on this issue, a motion the court

27  denied on March 7, 2003, on the "two authors" question, finding that genuine issues of material fact

28  persisted as to whether or not Winrater was in fact authored by two entities.

- 5 -

1    In <u>Aalmuhammed</u>, the Ninth Circuit established that the question of intent to merge contributions

2   into inseparable or interdependent parts of a unitary whole is separate from the question of co-

3   authorship. <u>Aalmuhammed</u>, 202 F.3d at 1231-32. Thus, while the Ninth Circuit found that all parties

4   involved intended that the plaintiff's contributions be merged into interdependent parts of the movie at

5   issue, the court also held that the movie was not a joint work because the parties were not "co-authors."

6   <u>Id.</u> at 1231-32, 1235. The Ninth Circuit identified the following factors as criteria for joint authorship:

7   1) control over the work, 2) audience appeal that turns on both contributions, and 3) objective

8   manifestations of shared intent by co-authors. <u>Id.</u> at 1234. While control will be the most important

9   factor "in many cases," the factors "cannot be reduced to a rigid formula, because the creative

10  relationships to which they apply vary too much." <u>Id.</u> at 1234, 1235. At summary judgment in the

11  present case, the court was not satisfied that Arrowhead had demonstrated, as a matter of law, "objective

12  manifestations of shared intent" by co-authors, a component that the court deemed "most

13  determinative...of co-authorship." Order Denying Defs.' Mot. for Summ. Judgment at 10. Instead, the

14  court denied the motion for summary judgment and the case proceeded to a jury trial.

15   Defendants' JMOL motion argues that plaintiff failed at trial to establish a legally sufficient basis

16  for a jury to conclude that the co-authors had not objectively manifested their shared intent. The jury

17  heard testimony and saw documentary evidence that plaintiff registered PrimeRater and defendants

18  registered Winrater's GUI with the Copyright Office separately. (Pl.'s Exh. 71, 123, 311; Tr. Vol. 1 at

19  139:1-7; 147:25-148:6; Vol. II at 44:6-45:11; Vol. VIII at 53:5-20). Had either Westbourne or

20  Arrowhead viewed either PrimeRater or Winrater as a joint creation they would likely have registered

21  either or both under both of their names. Furthermore, defendants failed at trial to show an intent of the

22  parties to be co-authors, a failure highlighted by the testimony of one of Arrowhead's own executives

23  that he had never "seen anyone at Arrowhead identify Winrater as a work of joint authorship." (Tr. Vol.

24  V at 161:6-10). This absence of objective manifestation of intent constituted substantial evidence that

25  neither party saw itself as a joint author of Winrater. In this situation, the jury found that Westbourne

26  and Arrowhead did not manifest their intent to be joint authors.

27   In short, defendants fail to establish as a matter of law the parties' intent to be co-authors.

28  Accordingly, they cannot show that the jury relied on an insufficient legal basis in deciding that Winrater

1  was not a joint work.

2

3  **D. PrimeRater as a Joint Work**

4  Defendants next argue that PrimeRater was a joint work to which Desmond and Arrowhead

5  contributed copyrightable parts and in which the two parties saw themselves as joint authors.

6  Defendants' contention rests largely on its belief that the algorithms and the data model existing in

7  Winrater constitute an essential part of PrimeRater as well.  Whether or not there were protectable

8  elements of expression within the algorithms and data model was a question for the jury.  See Harper

9  House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 207 (9th Cir. 1989).  In addition, Westbourne

10  presented ample evidence at trial from which a jury could reasonably conclude that Desmond, not

11  Arrowhead, authored the entirety of PrimeRater. (See, e.g., Tr. Vol. I at 116:22-117:8; Vol. V at 148:19-

12  149:2).  As there is sufficient evidence to support the jury's conclusion, the court denies the motion on

13  this ground.

14

15  **E. RE2 as an Infringing Work**

16  Defendants also claim that the evidence admitted at trial supports only the conclusion that RE2,

17  the rating engine they developed to replace Winrater and deployed on YouZoom.com, did not infringe

18  plaintiff's copyright in PrimeRater.  Specifically, defendants challenge each aspect of plaintiff's

19  infringement case-in-chief, arguing that several elements of PrimeRater do not qualify for copyright

20  protection and therefore cannot be infringed.  After considering the evidence in this case, the court

21  disagrees with defendants.

22

23  **1. String Literals and Error Messages**

24  First, defendants claim that PrimeRater's "string literals" – combinations of words and

25  abbreviations that operate within the program – as well as its error messages – short phrases informing

26  the user that a particular error has occurred – cannot be copyrighted because they lack originality and

27  are more utilitarian than creative.  But original organization and selection of noncopyrightable facts,

28  names, or phrases merit copyright protection.  See Feist Publications, Inc. v. Rural Telephone Service

1  Co., 499 U.S. 340, 361 (1991).  At trial, plaintiff demonstrated the presence of a large number of

2  PrimeRater's string literals and error messages in RE2.  (Tr. Vol. IV at 122:13-23; Pl.'s Exh. 142, 155).

3  The evidence was admitted to rebut defendants' assertions that certain of their witnesses independently

4  created RE2.  The presence of the same error messages in RE2 constitutes compelling evidence of

5  copying and undermined the credibility of defendants' witnesses.  Indeed, the jury specifically answered

6  a special question to that effect following the verdict, stating that RE2 represented a "derivative work

7  that infringes Westbourne's copyright in the PrimeRater rating engine."  Special Question 2.

8

9      **2. Data Model**

10     Second, defendants assert that the data model – a format for data interchange between the

11  graphical user interface and the rating engine – cannot constitute a source of infringement because it

12  inheres in the Winrater program and not in PrimeRater; rather than serving as an integral part of the

13  rating engine, the data model merely relays information between the engine and the interface.

14  Defendants also argue that Arrowhead played a large part in creating the data model, that the model used

15  in RE2 differs in important ways from that in Winrater, and that data models are not copyrightable.

16     Plaintiff introduced testimony, among other things, that the data model indeed falls within the

17  PrimeRater copyright.  (Tr. Vol. IV at 132:16-20).  Westbourne also furnished evidence that

18  distinguished between elements that existed outside of PrimeRater and the data model inherent to it.  (Tr.

19  Vol. II at 203:21-25; Pl.'s Exh. 136-2; Pl.'s Exh. 263-11).  Other substantial evidence contradicted

20  defendants' assertion that they contributed to the development of the data model. (Tr. Vol. I at 163:4-9;

21  171:10-20). Thus, substantial evidence in the trial record supports the jury's findings that the data model

22  belonged to PrimeRater, was copyrightable, and was copied without authorization.

23

24  **F. "Non-literal" Infringement**

25     Arrowhead next contends that Westbourne failed to establish that defendants' copying of "non-

26  literal" elements of PrimeRater amounted to infringement.  Defendants assert that processes such as

27  algorithms cannot be copyrighted and that any insurance rating engine would need to utilize similar

28  algorithms in order to generate a rate quote.  But defendants confuse insurance algorithms –

- 8 -

uncopyrightable methods of computing premiums that are standard in the industry – with the computer algorithms the software utilizes to implement the industry standard. Such implementation can amount to copyrightable expression of the processes and the jury found that it did. (Tr. Vol. III at 179:18-22). If defendants sought to rely on a merger defense – i.e. that there were so few manners of implementing the relevant algorithms that protecting the expression would essentially protect the idea – they bore the burden of proving that a merger situation existed. In this case, they failed to convince the jury that they had met that burden. The jury had the opportunity to observe the demeanor and assess the credibility of plaintiff's and defendants' lay witnesses and experts; the verdict indicates that the jury found plaintiff's evidence more compelling. For example, Westbourne put on evidence that 78% of elements in the RE2 code were similar or very similar to PrimeRater. (Tr. Vol. II at 83:1-14; Vol. V at 125:8-126:8; Pl.'s Exh. 215B, 215C). The jury could have found this evidence legally sufficient to conclude that copyright infringement had occurred. Thus, there is substantial evidence to support the finding of "non-literal" infringement.

## G. Infringing profits

Defendants next turn to the $5.8 million verdict the jury returned in favor of Westbourne. The copyright code awards infringing profits to the owner of the work equal to the infringer's gross revenues, less any deductible costs, apportioned to the copyrighted work. 17 U.S.C. §504(b). Defendants challenge three components of the profits award.

### 1. Gross revenues

First, defendants allege that plaintiff bore the burden of demonstrating a causal link between the gross revenues of Arrowhead and YouZoom and the infringement that took place. The court properly instructed the jury that plaintiff bore the burden of proving the defendants' gross revenue "from the use or sale of a product or work containing or using the copyrighted work." (Tr. Vol. VIII at 26:15-20). The requirement that the gross revenue must be linked to a use or sale "from" the product or work containing or using the copyrighted work is a sufficient causal nexus under Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 514 (9th Cir. 1985) and the Model Ninth Circuit Civil Jury Instruction §20.24. See also Three Boys Music Corp. v. Bolton, 212 F.3d 477, 487 (9th Cir. 2000).

- 9 -

1    Defendants cite a summary judgment case for the proposition that plaintiff must "proffer

2 sufficient non-speculative evidence to support a causal relationship between the infringement and the

3 profits generated indirectly from such an infringement." Mackie v. Rieser, 296 F.3d 909, 915-16 (9th

4 Cir. 2002). However, defendants in this case never moved for summary judgment on the grounds that

5 damages were too speculative, despite moving for summary judgment on five other grounds. That the

6 copyright infringement claim has survived summary judgment nevertheless provides some indication

7 that plaintiff has furnished "sufficient non-speculative evidence" to support the causal link.

8 Additionally, Westbourne offered evidence at trial that Arrowhead's revenues increased due to the

9 efficiency and accuracy of the engine. (Tr. Vol. V. at 245:6-17). Defendants' expert admitted that the

10 engine increased revenues and reduced costs. (Tr. Vol. VI at 42:3-5). Indeed, YouZoom's entire

11 business model involved making use of a rating engine to generate on-line premium quotes. This

12 evidence embodies a sufficiently clear link between infringement and defendants' profits. Furthermore,

13 defendants' post-trial statements and opposition to Westbourne's permanent injunction strongly indicate

14 that Arrowhead and YouZoom derive economic benefit from using PrimeRater. (See Decl. of Steve

15 Boyd in sup. of opp. to Pl's request for a TRO at 2 ¶2). Finally, the court offered to fashion a special

16 verdict or to ask special interrogatories  that could have determined with great specificity whether the

17 jury had found a causal link between profits and infringement. (Tr. Vol. VII at 83:9-18). But the parties

18 could not reach agreement on a unified special verdict and only plaintiff submitted special questions.

19 (Tr. Vol. VII at 84:12-86:12).  After reviewing the totality of the evidence, the court concludes that

20 substantial evidence exists to support a causal link between the copyright infringement and the jury's

21 award.

22

23    **2. Deductible costs**

24    Arrowhead next argues that the jury impermissibly deducted too little in costs.  Defendants

25 acknowledge that they bear the burden of proving expenses attributable to the infringement, citing

26 authority that deductions are allowed "only when the infringer can demonstrate that [the overhead

27 expense] was of actual assistance in the production, distribution or sale of the infringing product." Frank

28 Music Corp., supra., 772 F.2d at 516 (internal citations omitted).  Defendants claim that the jury

disregarded defendants' testimony and provided little if any cost deduction. (Tr. Vol. VI at 244:12-20).

1  However, the jury was free to reject expert testimony that conceded only $32,000 in profits after

2  deduction of so-called "overhead costs." Arrowhead bore the burden of showing that the costs it sought

3  to deduct were actually expended on the infringing products rather than overhead distributed widely

4  across the company's broader expenses. See Frank Music Corp., supra., 772 F.2d at 516. This was a

5  factual issue that hinged on the jury's impressions of the credibility of the various witnesses. Viewed

6  by the appropriate standards, the evidence was substantial enough to form a legally sufficient basis for

7  the jury's verdict.

8

9          3. **Apportionment**

10         Finally, defendants object to the jury's findings on the apportionment requirement. Arrowhead's

11  expert, Jeffrey Kinrich, employed a "cost" method of apportionment that reduced the final, apportioned

12  profits Arrowhead and YouZoom gleaned from RE2, after deduction of expenses, to $32,000. (Tr. Vol.

13  VI at 250:24-252:3; 247:16-250:19; 250:2-6). At trial, plaintiff's expert, Robert Mills, challenged Mr.

14  Kinrich's methodology and disputed his conclusions, arguing that a much greater proportion of revenue

15  should be apportioned to the infringement. (Tr. Vol. VI at 122:24-123:5; 123:6-16; 124:17-125:6). Mr.

16  Mills testified that "the longer Arrowhead infringes, the less credit [the opposing expert's] methodology

17  assigns to RE2 for the profits of Arrowhead." (Tr. Vol. VI at 126:6-8). Ultimately, the jury was

18  presented with two distinct models of apportioning the profits. Under 17 U.S.C. §540(b), defendants

19  were required to prove apportionment. Unfortunately for them, the jury chose to adopt plaintiff's

20  evidence and its expert's apportionment methodology over that of defendants. On the whole, the court

21  cannot say that the jury's decision to do so lacks a legally sufficient basis.

22

23  **H. Damages**

24         As a final matter, defendants contend that the jury impermissibly awarded Westbourne $823,000

25  in damages that plaintiff could not reasonably tie to any behavior by Arrowhead or YouZoom. The

26  damages value of a copyright, as acknowledged by defendants, consists of "what a willing buyer would

27  have been reasonably required to pay to a willing seller for plaintiff's work." Sid & Marty Krofft

28  Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157, 1174 (9th Cir. 1977). At trial,

plaintiff introduced a non-binding letter of intent it had negotiated with QuoteSmith.com, an Internet-

- 11 -

1   based insurance provider, reciting a fee of $823,000 for plaintiff's product and services. (Pl.'s Exh. 331,

2   333). Desmond also testified that the value of net profits from the QuoteSmith deal, which Westbourne

3   claimed was disrupted because of defendants' conduct, would amount to $1.9 million in 2000. (Tr. Vol.

4   IV at 8:13-23). Westbourne also introduced evidence that it had negotiated a licenses with two

5   companies, AIG and Sitel, and that defendants' infringement interfered with those negotiations and

6   displaced the licenses. (Tr. Vol. III at 226:5-8; 226:21-227:1; 228:20-229:10). Plaintiff sought to

7   convince the jury that defendants' infringement of PrimeRater led to several lost licensing opportunities,

8   among them the QuoteSmith negotiation. The jury, viewing the totality of the evidence, could have

9   concluded that Arrowhead and YouZoom were to blame for at least the QuoteSmith deal. Alternatively,

10  the jury may have awarded $5,823,000 in infringing profits and nothing in actual damages as the jury

11  rendered a general verdict on damages. Either way, viewing the evidence in the light most favorable to

12  Westbourne, the court cannot say that the jury acted on legally insufficient facts.

13       After considering all of the parties' arguments, the Court DENIES Defendants Arrowhead's and

14  YouZoom's motion for JMOL.

15

16  **III. MOTION FOR NEW TRIAL**

17  **A. Legal Standard**

18       Under Rule 59(a) of the Federal Rules of Civil Procedure, "a new trial may be granted to all or

19  any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for

20  any of the reasons for which new trials have heretofore been granted in actions at law in the courts of

21  the United States." Fed. R. Civ. P. 59(a). The decision to grant or deny a new trial rests within the

22  discretion of the court. Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980).

23       A court may grant a new trial if the verdict is "contrary to the clear weight of the evidence, or

24  is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a

25  miscarriage of justice." Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir. 1976). When a motion

26  for a new trial is based on insufficiency of the evidence, the motion should be granted "only if the verdict

27  is against the 'great weight' of the evidence or 'it is quite clear that the jury has reached a seriously

28  erroneous result.'" Venegas v. Wagner, 831 F.2d 1514, 1519 (9th Cir. 1987) (quoting Digidyne Corp.

v. Data Gen. Corp., 734 F.2d 1336, 1347 (9th Cir. 1984)). Generally, a court should not grant a new trial

1   unless after reviewing the evidence the judge "is left with the definite and firm conviction that a mistake

2   has been committed." Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1372 (9th Cir.

3   1987). While in the context of a new trial motion, "the trial court may weigh the evidence and credibility

4   of the witnesses, the court is not justified in granting a new trial 'merely because it might have come to

5   a different result from that reached by the jury.'" Roy v. Volkswagen of Am., Inc., 896 F.2d 1174, 1176

6   (9th Cir. 1990) (quoting Wilhelm v. Assoc. Container Trans. (Australia) Ltd., 648 F.2d 1197, 1198 (9th

7   Cir.1981)).

8

9   **B. The Jury Verdict and the Clear Weight of the Evidence**

10          Defendants begin by charging that the jury's findings were contrary to the clear weight of the

11  evidence and that therefore a new trial is warranted. First, defendants challenge the jury's finding, in

12  answering Question No. 1 of the Special Questions, that defendants' "use of the PrimeRater rating

13  engine in applications other than Winrater exceed[ed] the scope of the license held by Arrowhead."

14  Special Question No. 1. Arrowhead and YouZoom contend that the evidence plaintiff furnished at trial

15  cannot substantiate their claims.   Defendants also object to the jury's finding, in the second Special

16  Question, that RE2 constituted a derivative work that infringed PrimeRater's copyright. They argue that

17  the jury's infringement verdict depended improperly on finding copying of unprotected elements. Yet

18  adequate evidence existed on both grounds to support the jury's verdict. (See Tr. Vol. II at 183:5-11;

19  Vol. I at 147:25-148:6; Pl's Exh. 1; Vol. II at 19:13-19; Tr. Vol. IV at 122:13-23). The court cannot say

20  that the jury's verdict was contrary to the clear weight of the evidence. See Moist Cold Refrigerator Co.

21  v. Lou Johnson Co., 249 F.2d 246, 251 (9th Cir. 1957).

22

23  **C. Jury's Consideration of Joint Work Defense**

24          Arrowhead submits an affidavit signed by one of the jurors indicating that during deliberations

25  the jury "did not consider or address the issue of whether the Winrater program was a joint work." Decl.

26  of Garry Allan Self in Supp. of Defs.' Mot. for New Trial. However, Rule 606(b) of the Federal Rules

27  of Evidence bars Mr. Self's affidavit from being considered. In relevant part, the rule dictates that:

28          [u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify
            as to any matter or statement occuring during the course of the jury's
            deliberations...except that a juror may testify on the question whether extraneous

> prejudicial information was brought to the jury's attention...Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b) (emphasis added). Defendants apparently dispute that the jury's alleged failure to consider the joint work issue constitutes a "matter...occuring during the course of the jury's deliberations." Yet a juror's affidavit or testimony as to what the jury did or did not consider in the jury room clearly falls within the plain language of this rule which seeks to promote "freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment." See Note to Subd. (b) of Fed. R. Evid. 606(b). The countervailing interest in "not simply putting verdicts beyond effective reach" is reflected in the rule's exception for "extraneous prejudicial information" improperly provided to the jury. Id. Indeed, the Eighth Circuit case that defendants cite in their reply brief as authority for their contention that evidence of the consideration of affirmative defenses may be admitted involved just such an improper introduction of extraneous evidence that tainted the jury's verdict. See U.S. v. Brown, 108 F.3d 863, 867 (8th Cir. 1997). By contrast, no extraneous prejudicial information was given to the jury here and the narrow exception to Rule 606(b) therefore does not apply. Thus, under Rule 606(b), the court cannot consider Mr. Self's affidavit and will not grant a new trial on these grounds. Defendants did not come to agreement with plaintiff about a special verdict and did not submit additional special questions, following the verdict, about the joint work issue. Finally, plaintiff disputes the factual allegations recited in the affidavit and counters with an offer of proof that the jury did consider the joint work issue with regard to Winrater. In any event, defendants ultimately made a reasoned strategic decision to submit a general verdict to the jury, and the jury ruled against them.

## D. "Errors of Law"

Defendants next charge that "manifest errors of law" infected the trial and mandate a new one. These errors, according to Arrowhead, lie in the court's treatment of the standard for copyrightable works, its jury instructions, and its evidentiary rulings.

### 1. Copyrightability and Protectability

Arrowhead begins by arguing that the court improperly submitted the issue of copyrightability to the jury. Defendants, however, misconstrue the distinction between copyrightability and

- 14 -

protectability. Defendants correctly cite the Ninth Circuit model jury instructions, which state that "generally, whether a subject matter is copyrightable is a question of law to be determined by the court. This instruction is designed to inform the jury that the court has determined the subject matter to be appropriately copyrightable." See Comment to Ninth Circuit Model Jury Instruction No. 20.2. The court did precisely this, instructing the jury that "the works involved in this trial are computer programs...You are instructed that a copyright may be obtained in the works at issue," but clarified its instructions as to particular elements of a copyrightable work. (Tr. Vol. VIII at 8:14-19).

Whether particular elements of a copyrightable work deserve protection under the copyright law remains a separate question. Such a determination will often involve complex factual circumstances that a jury may be called upon to sort out. See, e.g., 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §12.20[B] at 12-179-180 ("threshold factual determinations...are for the jury"). Only when the factual record indicates incontrovertibly that a work or an element thereof does or does not merit protection will the court weigh in as a matter of law. In this case, whether string literals, error messages, or the data model represented protectable expression required a factual analysis that the jury properly performed.

The instructions guiding the jury's determinations mapped almost verbatim the Ninth Circuit's model jury instructions for copyright cases. In addition, defendants requested or stipulated to much of the language in the jury instructions relating to copyrightability and protectability. Under Rule 51 of the Federal Rules of Civil Procedure, "no party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict." Fed. R. Civ. P. 51. See also Hargrave v. Wellman, 276 F.2d 948, 950 (9th Cir. 1960). Defendants, after submitting the relevant instructions, cannot now be heard to object to them.

**2. Jury instructions**

Defendants also contend that several of the jury instructions were inadequately given and that a new trial is therefore warranted, citing Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir. 1990). In every instance, the instructions were consistent with Ninth Circuit law and the model jury instructions.

### a. Joint Work

First, defendants contend the joint work instruction improperly referenced the <u>Aalmuhammed</u> factors. This argument fails because <u>Aalmuhammed</u> recites valid Ninth Circuit precedent that applies to all potential joint work situations. Furthermore, the instruction given largely maps the Model Instruction. (Tr. Vol. VIII at 12:8-13:4; Further Comments to Model Civil Jury Instructions §20.7). Defendants also object that the instructions invited some confusion between the "two authors" determination and the other factors. But the instruction clearly asks the jurors to consider "whether both parties made objective manifestations of a shared intent to be co-authors during the creative process." (Tr. Vol. VIII at 12:23-25). After considering the proposed instructions, the court opted for the model Ninth Circuit instruction which properly stated the joint work factors in keeping with precedent in this circuit.

### b. Copyrightable elements

Arrowhead next asserts that the court erroneously instructed the jury about the copyrightable elements in PrimeRater. Instead, it points to several requested instructions that the court should have provided that would have better clarified precisely what elements of the program merited protection. In fact, the instructions the jury received effectively and properly outlined the analysis it was to apply in keeping with the model instructions and the state of copyright law. (<u>See</u> Tr. Vol. VIII at 21:18-22:4). Furthermore, the court properly instructed the jury as to the key elements of defendants' requested instructions that related to the scenes-a-faire and merger doctrines. (Tr. Vol. VIII at 22:5-11; 12-24).

### c. Standards of copying

Next, defendants object that the jury instructions contained references to both the "substantially similar" and "virtually identical" standards of comparing plaintiff's and defendants' works. In general, part of an infringement plaintiff's burden of proof is to demonstrate that the infringing work is substantially similar to the copyrighted creation. Such a standard can apply to computer programs as well as to other works. See Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442-43 (9th Cir. 1994). But when a work enjoys only "thin" copyright protection – i.e. it involves little creativity or consists mainly of factual elements – an infringement plaintiff may be required to demonstrate "virtual

01CV1800

identity" between the infringing and original works.  See Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991).  Defendants' assertions notwithstanding, not all computer programs merit only thin protection.  Arrowhead's use of Apple to that effect is misplaced and misleading.  Instead, determining what standard applies often requires factual findings.

Here, defendants sought an instruction only on the virtually identical standard, which would have imposed a more stringent burden on plaintiffs.  However, only the resolution of factual issues would determine what elements of PrimeRater merited merely thin protection.  Ultimately, it was up to the jury to make the necessary underlying factual findings in order to then apply the law.  The instructions reflected this need and were provided with clarity and accuracy.  (See Tr. Vol. VIII 18:5-8; 22:12-15).

### d. Inverse Ratio Rule

Arrowhead also contends that the court erroneously instructed the jury about the "inverse ratio rule."  Under well established copyright law, infringement plaintiffs must prove both that the defendant had access to the original work and that defendant copied the work, without authorization, into a new, substantially similar (or virtually identical) one.  According to Ninth Circuit precedent, courts will "require a lower standard of proof of substantial similarity when a high degree of access is shown."  Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1178 (9th Cir. 2003).  See also Shaw v. Lindheim, 919 F.2d 1353, 1361-62 (9th Cir. 1990) (stating that the inverse ratio rule "is the law of the circuit").  Defendants contend without justification that the rule is "mere dictum" and that the court should not have instructed the jury that the greater the access, the less the required similarity.  (See Tr. Vol. VIII at 19:18-22).  Here, the court is required to follow Ninth Circuit precedent as set forth in Rice v. Fox Broadcasting, supra., 330 F.3d at 1178.

### 3. Evidentiary rulings

#### a. Expert testimony

Arrowhead charges that the court impermissibly allowed plaintiff's expert opinion testimony that treated nonprotectable elements of PrimeRater as a source of the infringement.  Defendants claim that the court erroneously admitted evidence that the "string literals," error messages, and algorithms composing PrimeRater were infringed.  In fact, however, neither Martin Desmond nor Ellis Horowitz,

- 17 -

one of Westbourne's experts, testified that those elements in and of themselves deserved copyright protection. Both admitted, in fact, that names, which underlie the string literals, are not copyrightable. (Tr. Vol. II at 207:1-6; Vol. IV at 135:6-21). Likewise, neither expert argued that either the error messages themselves or the algorithms merited protection and indeed asserted the opposite. (Tr. Vol. III at 179:10-22). Instead, plaintiff and its experts claimed that the grouping or compilation of string literals and error messages were copyrightable expression. (Tr. Vol. III at 23:2-5). See Feist, supra., 499 U.S. at 358. Furthermore, the witnesses testified that the data model, as the implementation of the algorithm for computing rate quotes, represents protectable expression of the uncopyrightable "idea" of the algorithm itself. (Tr. Vol. II at 71:15-19). Such testimony was entirely proper, even helpful to defendants, and was justifiably admitted at trial.

### b. The Quotesmith deal

Next, Defendants argue that the non-binding letter of intent between plaintiff and QuoteSmith.com was improperly admitted into evidence. On December 23, 2002, the court granted defendants' motion for partial summary judgment and dismissed, among other counts, plaintiff's causes of action for interference with prospective economic advantage. Plaintiff's evidence that related to those causes of action, including documents or testimony relating to the QuoteSmith interaction – which Westbourne alleged Arrowhead disrupted – were excluded from trial. During trial, plaintiff established a sufficient foundation for the admission of the QuoteSmith evidence as it related to copyright damages. Plaintiff properly introduced Exhibit 333, the letter of intent signed by QuoteSmith, as evidence that Westbourne had lost licensing opportunities because of defendants' infringement, not because of its tortious interference conduct. The letter was highly relevant to plaintiff's claimed damages and was therefore properly admitted at trial.

### c. Mention of discovery violations

Finally, defendants contend that evidence of defendants' alleged misconduct during the discovery period should not have been admitted at trial. The court adequately settled issues concerning documents and impeachment from prior sworn testimony during trial, as the evidence developed. (Tr. Vol. IV at 243:25-247:18) And in other instances of alleged "false accusations," defendants failed to object

- 18 -

appropriately to the line of questioning and cannot now challenge those questions as erroneously allowed. Fed. R. Civ. Proc. 51. (See, e.g., Tr. Vol. V at 67:10-13). At trial, plaintiff effectively used prior sworn testimony from discovery to impeach several of defendants' witnesses. (Tr. Vol. IV at 204:4-205:7; 213:13-219:19; 225:17-226:8). Moreover, the court instructed the jury that the magistrate and district judges oversee and resolve any discovery issues. (Tr. Vol. VIII at 28:4-14). This was not error.

**E. Excessive damages**

Defendants next allege excessiveness of the damages awarded by the jury. Under the standard for excessive damages in a motion for new trial, the court must uphold the jury's verdict "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996). During the trial, the witnesses were afforded the opportunity to hear evidence from plaintiff's and defendants' damages experts as well as to observe their demeanor and assess their credibility in addition to those of all other witnesses. The court therefore concludes, given the totality of the evidence, that the award was neither grossly excessive, nor monstrous, nor clearly unsupported, nor based solely on speculation or guesswork. The parties effectively offered the jury the choice between defendants' $32,000 appraisal and plaintiff's $31 million estimate. The case was competently litigated by able attorneys and the jury carefully analyzed the evidence related to damages. There was substantial evidence to support the jury's award. For example, the documents from the QuoteSmith deal support an award of $7.2 million from lost licensing opportunities. The documents also support the argument that the rating engine was displaced by the Costco Insurance Program. (See Pl.'s Exh. 317, 331, 333). Additionally, the jury could have concluded that the license value of the rating engine was $1.9 million per license; the testimony showed that YouZoom granted 170 companies access to the rating engine. (Tr. Vol. IV at 8:13-23; Vol. V at 237:22-238:16). In the end, given all the evidence they had heard and seen during trial, the jury rendered a verdict that actually came in closer to the defendants' version of damages than to plaintiff's request for $31 million. The court concludes that the damages, while large, were not excessive.

## F. Discovery violations

Finally, defendants seek a new trial on the grounds that plaintiff failed to comply with a pretrial discovery order concerning production of Westbourne's financial records. Plaintiff challenges defendants characterization of the dispute. Defendants effectively impeached Mr. Desmond and Westbourne at trial on their financial situation reported to the IRS and the facts at trial. In any event, the court finds that the conduct was not prejudicial and does not constitute grounds for a new trial.

## G. Summary

For the reasons given above, the Court DENIES defendants' motion for a new trial. Had defendant secured an assignment of Desmond's and/or Westbourne's rights in PrimeRater through contractual arrangement, it would not be arguing this motion, nor facing a $5.8 million verdict. Instead, it asks this court to overturn a verdict duly and reasonably handed down by the jury. The clear weight of the evidence does not favor defendants, nor were the jury instructions erroneously given, nor was evidence impermissibly and prejudicially admitted.

## V. ATTORNEY'S FEES

### A. Introduction

Westbourne moved for recovery of attorney's fees on defendants' counterclaims. The Court, exercising its discretion, DENIES the request.

### B. Legal Standard

Section 505 of the Copyright Act states that a court may "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. §505. The Supreme Court vests broad discretion for such an award in the District Court, stating that "attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion. There is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised." Fantasy, Inc. v. Fogerty, 510 U.S. 517, 534 (1994) (internal citations omitted). The court proffered several factors for use in making an attorney's fees determination, including frivolousness, motivation, objective unreasonableness (legal and factual), and the need to advance considerations of competence and deterrence. Id. at 535 n.19. To

01CV1800

these, the Ninth Circuit has appended the additional factors of degree of success and the purposes of the

Copyright Act. <u>Ets-Hokin v. Skyy Spirits, Inc.</u>, 323 F.3d 763, 766 (9th Cir. 2003) (citations omitted).

The "prevailing party" for the purposes of attorney's fees can be either the defendant or the plaintiff;

"[p]revailing plaintiffs and prevailing defendants are to be treated alike." Fogerty, <u>supra.</u> 510 U.S. at 534.

## C. Discussion

Westbourne argues that defendants' amended counterclaim, which accused plaintiff of "incorporating important functions [of Winrater]...into Westbourne's" PrimeRater application, lacked any basis in fact or law. Amended Counterclaim at ¶23. Yet the court acknowledged, in declining to grant summary judgment on the infringement counterclaim, that Westbourne's display of the images – known as "screen shots" – of defendants' copyrighted graphical user interface (GUI) on plaintiff's Internet site could be an infringing use of the GUI. Order Denying Pl's Mot. for Summ. Judgment on Counterclaim for Copyright Infringement, at 18. In other words, a genuine issue of material fact existed as to whether infringement had occurred. While the jury ultimately rejected defendants' theory, it was not frivolous.

Plaintiff next alleges that Arrowhead's counterclaims were improperly motivated by a desire to delay proceedings and divert attention from its own infringement. Westbourne, however, offers insufficient evidence of improper motivation.

Westbourne also argues that defendants' counterclaims were objectively unreasonable because the "important functions" they alleged Westbourne appropriated in PrimeRater did not enjoy copyright protection and because any infringement on plaintiff's Internet site was *de minimis* and harmless. However, given the uncontroverted presence of portions of a copyrighted work on the Westbourne Internet site, coupled with the counterclaims' survival of summary judgment, the court cannot say that defendants' infringement argument was objectively unreasonable.

Plaintiff next contends that an award of attorney's fees in this situation would deter future parties from frivolously alleging infringement. But granting attorney's fees on these facts would also chill many reasonable or plausible infringement claims. Although plaintiff ultimately prevailed on the counterclaims, those claims were not so implausible as to lead the court to make an example of defendants for future litigants.

1    In addition, Westbourne asserts that its "complete" success at trial warrants an award of fees.

2    Plaintiff indeed succeeded at trial when the jury concluded that it had not infringed Winrater. Yet the

3    court will not automatically grant attorney's fees upon one party's courtroom victory, especially not

4    when Arrowhead prevailed on its counterclaim at summary judgment.

5    Finally, plaintiff contends that awarding attorney's fees in this case will effectuate the purposes

6    of the Copyright Act by protecting bona fide copyright holders against actual infringement. To be sure,

7    weeding out frivolous claims strengthens the copyright regime by focusing the court's energy and

8    resources on legitimate accusations of infringement. But on the evidence and the record before it, the

9    court cannot say that Arrowhead's counterclaims fall into the former category and not the latter.

10

11   **VI. CONCLUSION**

12   For the reasons set forth above, the Court DENIES defendants' motion for judgment as a matter

13   of law, DENIES defendants' motion for a new trial, and DENIES plaintiff's motion for attorney's fees.

14   The Court also STAYS THE EXECUTION of judgment for 30 days from the date of this order to permit

15   defendants to seek a bond pending appeal or to exercise any appellate remedies.

16

17   IT IS SO ORDERED.

18   Dated: 12/2/03

19

20                                   MARILYN L. HUFF, Chief Judge
                                     UNITED STATES DISTRICT COURT

21

22

23   Copies to:

24   Gregory S. Dovel
     Dovel and Luner
25   201 Santa Monica Boulevard, Suite 600
     Santa Monica, CA 90401

26   Randy M. McElvain
     Weston and McElvain
27   888 West Sixth Street, Suite 1500
     Los Angeles, CA 90017

28

01CV1800